**BASSETT FURNITURE INDUSTRIES OF NORTH CAROLINA, INC., d/b/a Bassett Furniture Industries of Georgia, Plaintiff-Appellant Cross-Appellee,**

v.

**NVF COMPANY, Defendant-Appellee Cross-Appellant.**

No. 76–1312.

United States Court of Appeals, Fifth Circuit.

July 20, 1978.

Benjamin M. Garland, F. Kennedy Hall, Macon, Ga., for plaintiff-appellant cross-appellee.

George C. Grant, Macon, Ga., for defendant-appellee cross-appellant.

Before WISDOM and GEE, Circuit Judges, and VAN PELT *, District Judge.

VAN PELT, District Judge:

This is an appeal and cross-appeal from a jury verdict finding NVF Company 55% negligent in the manufacture of a substitute veneer substance known as Yorkite [1] and Bassett Furniture Company of Macon, Georgia, 45% negligent in the use of the product. The jury awarded $1,204.16 in damages to Bassett Furniture Industries, which the trial judge, without request or briefing by the parties, increased to $6,622.90 upon Order finding that the "undisputed" damages in the case amounted to $12,041.63 and that the award should be decreased by plaintiff's 45% negligence. NVF had counterclaimed for $73,739.86, plus interest, for goods sold and delivered to Bassett. Prior to trial, the parties stipulated that the correct amount due and owing to NVF was "$66,965.84, after the giving of credit by defendant to plaintiff for replacement of allegedly defective goods." The trial court entered judgment for this latter amount, with interest running from the date of the stipulation. NVF filed a Motion to Alter or Amend the Judgment on Counterclaim alleging that interest should run from the date the last invoice became due, November 19, 1973, instead of from the date of the stipulation, September 3, 1975. This motion was granted. Defendant NVF then filed an objection to the taxing of plaintiff's costs against it. NVF alleged it was the prevailing party since the judgment awarded NVF was far greater than the judgment awarded plaintiff, Bassett. Plaintiff responded that because it had received a judgment, it was the prevailing party despite the variance in amounts. The trial court ordered that each party bear their own costs.

Bassett raises the following issues on appeal:

1. Whether the trial court erred in failing to grant Bassett's Motion for a Directed Verdict and Motion for Judgment Notwithstanding the Verdict on the breach of warranty issues;

2. Whether the trial court erred in finding that Bassett had failed to prove lost profits with reasonable certainty and in refusing to submit that issue to the jury;

---

* Senior District Judge of the District of Nebraska, sitting by designation.

1. Yorkite is used in furniture manufacturing. It is made from wood pulp in the form of sheets which are chemically bonded together with zinc chloride and heat. The zinc chloride is then taken out through a leaching process and the product is then dried and put into the form of rolls. A sheet of Yorkite is later glued on the top of what will become a table, a wood grain is stamped on it, it is stained and goes through a variety of other processes to make the end product look like solid wood.

3. Whether the trial court's reminder to a witness that he was under oath and could be prosecuted for perjury was prejudicial;

4. Whether the trial court erred in permitting a witness for NVF to give expert testimony;

5. Whether the trial court erred in its evidentiary ruling that witness Tompkins had not overheard enough of a conversation between Bassett and NVF personnel to be able to relate certain statements as an admission against interest by NVF's agents;

6. Whether the trial court erred in allowing NVF interest from the date of the last invoice; and

7. Whether the trial court erred in failing to tax plaintiff's costs to defendant.

NVF raises the following issues by way of cross-appeal:

1. Whether the trial court erred in denying defendant's Motion for Judgment Notwithstanding the Verdict on the issue of negligence;

2. Whether the trial court erred in raising the damage award against the defendant to $6,622.90 from the $1,204.16 awarded by the jury;

3. Whether the trial court erred in failing to tax defendant's costs to plaintiff; and

4. Finally, in the event we should reverse on the negligence issue, NVF alleges that the trial court erred in ruling that their order acknowledgment excluding liability was invalid.

## I. BREACH OF WARRANTY AND NEGLIGENCE ISSUES

■ Bassett claimed at the trial that the Yorkite supplied by NVF breached an express warranty contained in a sales brochure (in violation of Ga.Code Ann. § 109A–2-313), an implied warranty of merchantability (in violation of Ga.Code Ann. § 109A–2 314), and an implied warranty of fitness for a particular purpose (in violation of Ga.Code Ann. § 109A–2–315). The jury was given a special verdict form where they

were required to consider each warranty separately, answer whether there had been a breach of any of the three warranties, and, if so, whether damages resulted to Bassett from the breach. The jury answered each of the warranty questions in the negative. Bassett's motions for directed verdict and for judgment notwithstanding the verdict on the warranty questions were denied. Bassett also alleged negligence in the manufacture of Yorkite. In answering the special verdict the jury found NVF 55% negligent. NVF's motion for judgment notwithstanding the verdict was denied. Both parties have appealed the adverse rulings.

*Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc) sets forth the standards for ruling on directed verdicts and judgments n. o. v. These standards are also applicable upon appellate review. *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835 (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). In essence, the court is to consider all of the evidence in the light most favorable to the party opposed to the motion.

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. . . . There must be a conflict in substantial evidence to create a jury question. However, it is a function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of the witnesses.

*Boeing, supra* at 374–75.

We have carefully reviewed the record and do not believe the evidence was overwhelmingly in favor of one party or the other on these issues. In fact, the evidence was highly conflicting. It is not for us to retry this case. The jury had before it all of the issues, and the form of special verdict ensured that they considered each one separately. We find substantial support in the record for the verdict.

Bassett introduced evidence to show that in January, 1973 NVF had performance standards for absorption and tear tests which were abandoned in March, 1973 and not resumed at the time here in question. During March, 1973 they had to find a new supplier of pulp and several sources were tried. Finally, on October 12, 1973, a statement was made by the company that effective immediately it would no longer make Yorkite II because of a demise of raw materials, but would introduce Yorkite III made from different materials. During September they were aware that they needed a better paper formation (distribution of paper fibers). The technical department requested a better formation on September 4, 1973 because of mottling which occurred while it was still in the form of paper and before it had been made into Yorkite. There was another paper order dated September 21 stating paper formation must be improved.

Bassett first experienced difficulty on September 18. The standing room had "pickouts" or craters in the table tops leaving uneven rough places. It was discovered in the packing room that the tops of some of the hex commodes which had completely gone through the finishing process and were ready for packing had blisters or bubbles. However, no one noticed anything unusual about this shipment of Yorkite until it had gone through the sanding process. After Bassett complained, it was noticed that the paper Bassett experienced difficulty with was more mottled than usual.

NVF introduced evidence that Bassett was phasing out their use of Yorkite and going to a new process whereby different equipment, including a new sander, was needed. Large amounts of sandpaper had been returned to their supplier in April. NVF's theory was that Bassett did not anticipate the delays in getting all of their equipment needed for the new manufacturing process[2] and were not using the proper grade of sandpaper. It was never specifi-

cally shown what grade of sandpaper Bassett used at the time they encountered difficulty. It was shown, however, that Trogdon Furniture Company received Yorkite from the same roll as Bassett and used it in their furniture manufacturing without experiencing any difficulty. However, their product was a six foot high cabinet as opposed to a small hex commode of the kind made by Bassett. It is possible the jury found that there was no ultimate difference between Bassett and Trogdon's use of the Yorkite, that while NVF was negligent in the manufacture of the York II, it was not of such magnitude to constitute a breach of warranty, and that Bassett was almost equally negligent in their sanding process.

## II.  LOST PROFITS

Bassett claimed that because of the defective Yorkite, they were required to resand and rework numerous tables with the result their production line was greatly slowed down for 17 days between September 17 and October 8, 1973. Bassett claimed they were entitled to $114,428.34 in lost profits. The trial court, after having conducted pretrial conferences concerning this issue and listening to testimony at the trial, concluded that the evidence did not rise to the reasonable certainty of proof required under Georgia law. At a minimum the Georgia law requires that lost profits be shown with reasonable certainty. *Summerfield v. DeCinque,* 143 Ga.App. 351, 352, 238 S.E.2d 712, 714 (1977); *Appling Motors, Inc. v. Todd,* 143 Ga.App. 644, 645, 239 S.E.2d 537, 539 (1977); *Crankshaw v. Stanley Homes, Inc.,* 131 Ga.App. 840, 843, 207 S.E.2d 241, 243 (1974). The Georgia courts have also stated that:

> Generally, unless lost profits are capable of definite ascertainment, and are traceable directly to the acts of the defendant, they are not recoverable.

*Marco Publications, Inc. v. Southern Airways, Inc.,* 139 Ga.App. 808, 809, 229 S.E.2d 664, 665 (1976); *Tri-State Systems, Inc. v.*

2.  The reverse roller coater was not received until September 28. The new process using a polyester resin instead of Yorkite with an ultra-

violet light as a drying agent was first used November 22, 1973.

*Village Outlet Stores, Inc.,* 135 Ga.App. 81, 84, 217 S.E.2d 399, 402 (1975); *Kingston Pencil Corp. v. Jordan,* 115 Ga.App. 333, 335, 154 S.E.2d 650, 653 (1967).[3]

Under Georgia law, it could not be said that plaintiff showed lost profits capable of definite ascertainment or even with reasonable certainty. All of their computations incurred difficulties of one kind or another. Robert George, the plant manager, testified that Exhibits 3 and 4, showing scheduled production during the 17 day period in question, were not based on any company records, but his estimate of how many tables should have been produced. However, he admitted that the actual production would be affected by variables such as weather temperature, which would affect how quickly the glue dries, human mistakes, and absenteeism. He also admitted that for Bassett's own purpose they used a time span in calculating scheduled production and not a day by day basis such as was attempted here. The material cost came from cost sheets prepared in advance of actual production and were estimates. The selling price came from the sales catalog. In actuality, the parent company fixes the selling price and any customer allowances or reductions are made by the parent company who receives all of the Macon plant's product. NVF was charged with the costs of running the entire plant during the 17 day period including administrative and overhead expenses, factory expenses, including lights and power, FICA and unemployment monies, vacation expenses, etc. In computing factory expenses, the actual expenses in September were divided by $11/19$ for the 11 days allegedly involved and the total expenses for October were divided by $8/23$ for the 8 days allegedly involved in October. This included goods actually received during those months regardless of whether they were used then or not. Insurance and depreciation were figured on a work day basis instead of a daily basis. In computing lost profits Bassett also charged the total labor expenses to NVF. However, William Handy, the assistant superintendent in Macon, testified that in order to keep people busy they ran other groups of tables that were not scheduled for production (Tr. 484). As a matter of fact, Handy admitted work was done on other groups of tables on September 17, 18, 19, 24, 25, 26, 27, October 1, 2, 3, 4, and 5 (Tr. at 486–98). As the trial court repeatedly told counsel:

> There is no obvious easy solution to it but y'all are using ten different approaches. You are using accrual one moment, cash another, you leave your work in progress out the next moment. You are just not starting from one end and going to the other with any consistency, as I see it.

Tr. at 533. Bassett did credit NVF with the dollar value of the tables actually produced during the 17 day period. However, because of the length of time it takes a finished table to come off of the assembly line, these tables were not made during the 17 days in question. Substantial work had been done on them prior to this 17 day period. It was not shown that this credit could make up for the fact Bassett was charged for total plant expenditures completely unrelated to production of the tables in question. The entire method of calculation was highly speculative.

There is no merit to the argument that the court directed a verdict on lost profits. Plaintiff was given adequate time and opportunity to prove this issue. Extensive testimony and discussion centered on their method of proof. Plaintiff points out nothing else that would have strengthened its case. As stated in *Tri-State Systems, supra,* 217 S.E.2d at 403:

> While [appellant] was not required to prove its damages to the exact dollar, it was required to provide some rational basis of computation.

We think the trial court was correct in its ruling on lost profits.

---

3. It is interesting to note that the above "reasonable certainty" cases have either affirmed lower court awards for lost profits or, in the case of *Crankshaw, supra,* found that a directed verdict for defendant was improper while the "definite ascertainment" cases have had the effect of denying recovery for lost profits either by reversal of lower court awards or affirmance of such denial in the lower court.

## III. THE COURT'S COMMENTS

█ Bassett called as a witness Russell Fafette, who had previously been the product manager with NVF selling Yorkite. At the time of the trial he was selling a competitive product. Mr. Fafette was asked if he had tried selling his new product to Bassett. Fafette answered that the question was irrelevant. The court then stated Fafette would have to answer Yes or No. Fafette rather emphatically denied he had tried selling to Bassett, spelling out the word N–O. NVF's counsel then asked him to look at his deposition and attempted to impeach him. However, the court interrupted by stating:

THE COURT: Wait just a minute. Mr. Witness, look at page 39 of your deposition. Read that page. Will you reconsider that answer you gave? Let me tell you something. You raised your right hand and swore to tell the truth and nothing but the truth so help me God. Look at me. The Court process would not exist except for people coming in and telling the truth. We have laws against perjury, and let me warn you right now that in the event you perjure yourself in this Court, it will be referred to a grand jury of this Court and it is a felony under the laws of the United States, and I am now giving you an opportunity to reconsider your answer and correct it if you wish to.

THE WITNESS: If you will let me answer the question. The way the question is I can't answer it yes or no, effectively.

THE COURT: You say in there you have called on people, and you name them, Bassett Furniture Company, and your answer "no" that you have not tried to sell your product to them? Now you explain that.

THE WITNESS: Am I allowed to explain it?

THE COURT: Yes sir, you sure are.

THE WITNESS: O.K. It was a yes or no before. What I have done basically in the past with Bassett Furniture is primarily test, because of the manufacturing techniques that Bassett has, Bassett could be perhaps my last customer to convert to the product I presently have. To say that I have tried to sell them, in that sense, yes. But I know that realistically they would be the last customer that I would develop with the spantext product. So the answer to your question —yes.

Tr. at 595–96.

The court made no further comments, and, in fact, prevented counsel from going further into the transcript by indicating that there was no need to show with whom Fafette had talked or how many times he had visited Bassett personnel. The deposition had been taken approximately a week before the trial.

The better practice would have been for the court to excuse the jury before warning the witness that he could be prosecuted for perjury. However, we do not find it reversible error. The witness was allowed to explain his answer and the court made no further comments. *See Manchack v. S/S Overseas Progress*, 524 F.2d 918, 919 (5th Cir. 1975) regarding the trial court's discretion to participate in the trial provided his attitude is not one of partisanship. The court's comments do not indicate partisanship here, but rather a concern for obtaining the truth from a witness who appeared less than cooperative.

## IV. EVIDENTIARY RULINGS

█ Appellant complains that the court erred by (1) allowing Leslie Towle to give expert testimony, and (2) excluding testimony of two witnesses which it is argued should have been admissible as admissions against interest.

Towle testified that NVF and Spaulding Fiber Co. were the two main manufacturers of vulcanized fiber products in the world. Towle had worked for Spaulding in various capacities. He had been assistant manager and manager of the vulcanized fiber department and vice president of the industrial plastics division which encompassed all of the operating departments, including vul-

canized fiber paper. Yorkite is a vulcanized fiber product. Bassett complains that Towle was allowed to give his opinion with reference to the sanding procedures used in the furniture manufacturing process when he had not been shown to have any experience in furniture manufacturing.

Towle testified that Spaulding had made a product similar to Yorkite which had mottling. Spaulding experienced difficulty with pick-outs until they changed the type of sanding wheel they were using. Then they were able to achieve a smoothness. On the basis of this experience Towle was allowed to give an opinion as to whether a piece of allegedly defective Yorkite could be sanded and achieve a smoothness or whether if it were not properly sanded it might have pick-outs.[4] The trial judge noted that sandpaper was used in both instances and that different kinds of sandpaper produced different results. This was testified to by one of plaintiff's own witnesses who indicated when they first started using Yorkite they did not have the proper equipment for sanding. This court has previously stated that the admissibility of expert testimony is a matter which rests within the broad discretion of the trial judge and his decision is not to be disturbed unless it is manifestly erroneous. *United States v. Lopez*, 543 F.2d 1156, 1158 (5th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977). The testimony complained of related to sanding a vulcanized fiber product—an area in which Mr. Towle did have expertise. We believe the trial court properly admitted his testimony.

■ Regarding the exclusion of testimony, Bassett witness Earl Tompkins, stated that he overheard two persons from NVF talking with Bassett's purchasing agent. Tompkins testified that the men were discussing the Yorkite problem and

> Something was said about a bad acid, probably a bad acid, the way it was bonded together.

Tompkins stated that was all he heard and the court ruled that the jury should disregard it "as simply an incomplete statement on which you cannot draw a conclusion." Tr. at 250. Counsel did not at that time make an offer of proof or argue it was admissible as a statement against interest. It is clear the witness did not overhear or recall the entire conversation, the testimony was vague and the trial court properly told the jury to disregard it.

■ The second exclusion occurred when Mr. Fafette was asked whether he had had a conversation with Mr. Street, NVF's director of primary products division, concerning the problem at Bassett. Counsel did make an offer of proof and indicated that it would qualify as an admission against interest. The offer of proof was Fafette would testify that Street told him that Creighton authorized the shipment of Yorkite in an "unusual manner" and that special consideration was given to the shipment. This testimony would have been vague and indefinite at best. It was unclear how Street knew Creighton had authorized the shipment in an unusual manner. Street was not a witness and Fafette

---

4. After objections were made, Towle finally answered:

> In answer to that my experience is on a very similar product that it is possible to achieve a very smooth surface without resulting roughness if the proper sanding wheel or belt is used.

Tr. at 687. Towle did not represent himself as being an expert in the field of furniture manufacturing. On cross-examination he testified:

> I think I testified, sir, that I am not familiar with the furniture industry. I have not been in the furniture manufacturing plant and so I cannot qualify as an expert as to whether or not these samples, which are marked bad, could be used. I am merely saying on the basis of my experience in the vulcanized fiber industry and on sanding, which we have done on fiber, that it would seem to me that it was entirely possible to sand out these blisters. Whether or not that, in fact, could be done is something I would not venture an opinion on.

Tr. at 710. On direct examination he had testified:

> Q. In your opinion, is that Yorkite there a product which can be sanded and used in furniture manufacturing?
> A. On the basis of my experience I would say yes.

Tr. at 676. It was for the jury to assess his credibility.

was far removed from anything which had occurred.

Creighton had already been a witness. He admitted that he was not satisfied with the formation of some of the lots of paper, including the one made into Yorkite for Bassett, that it looked mottled and that it was shipped anyway. He was not asked whether the Yorkite was shipped under unusual circumstances or given special consideration. As a matter of fact, Creighton testified that he did not participate in the determination to ship the Yorkite. We find no prejudicial error where the jury was alerted to the fact that Bassett knew it was having paper formation problems and that the paper was shipped anyway—it was not shown in the offer of proof that anything more damaging would have been proven.

## V. JUDGMENT AND COSTS

Both parties allege errors in the court's final judgment and awarding of costs. Specifically before us is whether the trial court erred by (1) allowing interest on the stipulated amount due and owing NVF; (2) entering a judgment for Bassett in the amount of $6,622.90 after the jury had awarded the $1,204.16, and (3) making each of the parties bear their own costs.

Beginning with the question of interest on NVF's counterclaim, the invoices showed $73,739.86 due and owing for material delivered between September 7, 1973 and October 29, 1973. NVF's counterclaim requested interest. Bassett's answer to the counterclaim was in essence a general denial that plaintiff was indebted "but rather defendant is indebted to plaintiff as shown by plaintiff's complaint." R. at 26. However, plaintiff did admit in its October 21, 1974 Supplemental Answers to Defendant's First Interrogatories that:

Were it not for our claim for damages, plaintiff admits that it would then be

indebted to defendant in the amount of $63,744.99 ($73,739.86 less $9,994.87, the total of replacement orders).

R. at 132. The court's pretrial Order, filed October 16, 1974, and signed by the attorneys for both parties, also states that plaintiff recognizes the amount and correctness of the invoices, except for those relating to replacement of defective Yorkite. Almost a year later, on September 3, 1975, a stipulation was entered into by both parties setting the amount due and owing to Bassett at $66,965.84.[5] The trial court entered judgment for this amount, with interest running from the date of the stipulation. However, NVF filed a Motion to Alter or Amend Judgment on Counterclaim alleging that interest should run from the due date of the last invoice. This motion was granted.

Bassett argues (1) that the stipulation made no mention of interest at all and there should be none awarded and (2) that the claim was unliquidated up until the time of the stipulation.

■ The stipulation indicated that the correct amount due on the counterclaim was $66,965.84. The counterclaim requested interest. The stipulation cannot be read as dropping the claim for interest, but merely substituting $66,965.84 for the amount requested in the original counterclaim.

Ga.Code Ann. § 57–110 provides:

All liquidated demands, where by agreement or otherwise, the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them . . .

■ NVF argued, and the trial court found, that the case of *Buck Creek Industries, Inc. v. Crutchfield & Co.*, 133 Ga.App. 80, 210 S.E.2d 32 (1974) was controlling on

---

5. The actual text of the stipulation reads:

STIPULATION OF PARTIES
AS TO AMOUNT DUE UNDER
COUNTERCLAIM

Plaintiff and defendant hereby stipulate and agree that the correct amount due by Plaintiff, Bassett Furniture Industries of

Georgia, Inc., to defendant, NVF Company, for goods sold and delivered to Plaintiff by defendant, as alleged in the counterclaim by defendant against plaintiff, is $66,965.84, after the giving of credit by defendant to plaintiff for replacement of allegedly defective goods.

the question of what constitutes a liquidated claim. In that case the seller on open account sued to recover for goods delivered plus interest. The buyer answered denying any amount due and setting up the defense that the yarn delivered was defective. At the trial, the jury found for the seller in the entire amount of his invoices and awarded nothing to the buyer. The court found that the total amount due and owing on account was

> ascertained and the defendant owed *interest* thereon, subject to reduction if it could establish that its retention of a part of the purchase price after the due date was justifiable.

*Id.* at 82, 210 S.E.2d at 33–34. It is true there is a great deal of language in *Buck Creek* indicating that an amount certain cannot be rendered uncertain by means of "an unsuccessful defense", "no defense", or an invalid defense. Bassett argues that unless the buyer recovers absolutely nothing, the claim is unliquidated. This was the concurring opinion's position in *Buck Creek*. If *Buck Creek* were the only Georgia case on this issue, we would admit to being uncertain of the Georgia law. However, in an earlier case, *Haygood v. Smith*, 80 Ga. App. 461, 56 S.E.2d 310 (1949), the court found that where a contractor furnished material, labor, and supplies, and the buyer withheld payment because of a crack in the wall, that the balance was liquidated when the bill was submitted.

> The final balance due on the agreement, based on actual expenditures and fixed fees for supervision and other services, was due when the bill was submitted, and constituted a liquidated demand which bore interest from that date. Those things which are not liquidated are only whatever credits might be due to the defendants on account of the crack in the wall and some of the other items which the defendants claim in reduction of their indebtedness, but these items would only reduce the net balance of the plaintiff's liquidated demand.

*Id.* at 465, 56 S.E.2d at 314. The same situation existed here. There was no question the material had been delivered and

the entire amount of the bill was ascertainable. It was the credits which were unliquidated. The trial court did not err by awarding interest from the date the total invoices became due.

We next consider the judgment awarded Bassett. Bassett computed their cost of refacing, relaying, re-machining and refinishing the table tops and panels at $12,041.63. This included labor, overhead, and materials such as glue, sandpaper and ink. Each item was shown separately in plaintiff's Exhibit 2. The jury awarded $1,204.16 in damages, which was exactly 10% of the amount shown on Exhibit 2. The special verdict form shows the foreman had first written in what looks like $1204.63 and then changed it to $1204.16. It is apparent the jury intended to award exactly 10% of the total amount. The trial court, without request, raised the award to $6,622.90 upon an order finding that the "undisputed" damages were $12,041.63 and reducing that amount by Bassett's 45% negligence.

█ It is rare for a judge to raise a jury award without request by one of the parties. In a hard fought, contested trial such as this, it is rare that an issue such as the cost of reworking tables would be "undisputed", particularly after the evidence regarding lost profits was shown to have such deficiencies as to not even be sufficient to be submitted to the jury.

Early in the charge the jury was instructed by the court that if they found both parties negligent

> but that the plaintiff Bassett was less negligent than the defendant NVF, then there could be a recovery, but the amount of damages awarded should be reduced by you in proportion to the amount of negligence attributable to each of the parties.

Tr. at 858. However, the court later instructed the jury:

> You will recall, ladies and gentlemen, that the Court told you that in the event you were to find that both parties were negligent, but that Bassett was less negli-

gent than NVF, there could be a recovery but you would reduce damages in proportion to the amount of negligence on the part of Bassett. In this case we are dealing with two theories of law. One is negligence and one is warranty. The Court, ladies and gentlemen, instructs you in this case, to merely answer the questions pertaining to negligence, and when you get to damages disregard the Court's instructions to reduce those in proportion to the amount of negligence on a comparative basis. The Court will deal with that issue in response to you answering these questions. You just put the total amount of damages, if any, that you would award under either theory, without diminishment on account of that theory of law on comparative negligence and then the Court will deal with that in response to your answers.

Tr. at 864–65. Although neither of the parties has complained of error in the charge of the court, it appears to us that the jury might have become confused and attempted to proportion damages. The jury was instructed that if the parties were equally negligent there would be no recovery. Tr. at 858. The jury might have assumed that in this case where plaintiff was 45% negligent and defendant was 55% negligent plaintiff would recover only 10% of the total award.[6] This would support the trial judge's action in increasing the award. However, we do not believe it could be said that the damages were undisputed. Plaintiff's Exhibit 2 was in evidence but the jury was not required to accept it without reservation. Certain of the figures and calculations appearing on this exhibit were never explained (i. e. packing room labor and "OH Factor 74.1%" which combined

represented $4,973.80). Bassett never conclusively showed that percentage of these tables was originally discovered to be defective. When the problem was noticed, they pulled all of the pieces off the assembly line and completely reworked them. The jury might have concluded this was unnecessary. We cannot conclude from the record whether the trial court confused the jury by its charge, or whether the jury did not believe all of plaintiff's evidence concerning damages, or whether it concluded some of the claimed items of damage were not established by a preponderance of evidence.

We do conclude a fair award, if any award is to be made plaintiff, can only be secured by a new trial. We also conclude the trial court did not abuse its discretion by making the parties each bear their own costs. This case is reversed and remanded for a new trial only on damages, and affirmed in all other respects, including the jury's finding as to breach of warranty, lost profits, and negligence, including the comparative percentages of 55 and 45 percent.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**6.** NVF has argued that the 10% awarded by the jury was in fact correct under Georgia's comparative negligence law. We simply find no support for this in the Georgia case law. Cases such as *Griggs v. Holloway*, 91 Ga.App. 333, 336–37, 85 S.E.2d 524, 526 (1954) clearly state the jury was instructed that if both parties were negligent the jury is to reduce the amount of damages which would have otherwise been awarded in proportion to the amount of fault or negligence attributable to plaintiff. It cannot be clearer that in this case 10% was

not the negligence attributable to Bassett, but 45% was the negligence of Bassett as found by the jury. *See also Ault v. Whittemore*, 73 Ga. App. 10, 35 S.E.2d 526 (1945); *Mishoe v. Davis*, 64 Ga.App. 700, 14 S.E.2d 187 (1941). We believe that this court was not in error in *Southern Ry. Co. v. Neely*, 284 F.2d 633 (5th Cir. 1960) in assessing damages based on the percentage of fault and observing that Georgia courts had almost universally construed the law to be such.