**WALTON MOTOR SALES, INC., et al.,
Plaintiffs-Appellees, Cross-Appellants,**

v.

**F.H. ROSS, Jr., and Ernest Schleussener, Sr., Defendants-Appellants,
Cross-Appellees.**

No. 82–8640.

United States Court of Appeals,
Eleventh Circuit.

July 19, 1984.

---

Paul W. Calhoun, Jr., Vidalia, Ga., for defendants-appellants, cross-appellees.

H. Jerome Strickland, Hubert C. Lovein, Jr., Macon, Ga., for plaintiffs-appellees, cross-appellants.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

WISDOM, Senior Circuit Judge:

In this diversity case controlled by Georgia law, we are presented with a dispute between a creditor (the defendant, F.H. Ross) and a debtor (the corporate plaintiff, Walton Motor Sales, Inc.[1]) over the proceeds from the liquidation of the plaintiffs' business. The defendant held security interests in three tracts of real estate owned by the corporate plaintiff and in the personal property and inventory of that plaintiff. After a number of defaults on the part of the corporate plaintiff, Ross sold all of this property to satisfy the corporate plaintiff's indebtedness to him. Alleging that these sales produced a surplus of proceeds over debt, the plaintiffs brought suit. The district court found that a surplus resulted from the foreclosure sale of the real estate, but that a deficiency arose from the sales of personal property and inventory. The court subtracted the deficiency from the surplus and entered judgment in favor of the plaintiffs. Both the defendant and the plaintiffs appealed, attacking various aspects of the district court's decision.

The transactions in this case took place 15 to 20 years ago. This tired lawsuit has been in the courts for over thirteen years, a period of time that has witnessed the

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The individual plaintiffs—George, Francis, and Lindsey Walton—were the former owners, officers, and directors of the corporate plaintiff.

deaths of the principal individual plaintiff, one of the plaintiffs' attorneys, and the district judge to whom the case was originally assigned.[2] The district court's judgment reflects a great deal of thought and effort. Nevertheless, we cannot affirm the judgment in all respects. We affirm in part, reverse in part, and remand with instructions to enter judgment for the plaintiffs in the amount of $55,205.84 plus interest.

## I. FACTS

Walton Motor Sales, Inc. (Walton) was a car dealership located in Vidalia, Georgia. As a result both of direct lending from Ross to Walton and of Ross's assumption of Walton's debts to others, Walton became heavily indebted to Ross during the mid-1960s. To protect his extensions of credit, Ross obtained security interests in virtually all of Walton's business assets, including three tracts of real estate and the personal property and inventory of the corporate plaintiff.[3] Walton's car dealership and a bowling alley and roller skating rink that Walton operated were located on the land.

In addition to acquiring security interests in Walton's business assets, Ross took other steps to protect his position. On February 24, 1965, the individual plaintiffs pledged their stock in Walton to the defendant. On April 22, 1965, the parties executed an agreement entitled "Contract as to Fiscal and Credit Policy Controls". This agreement granted Ross "full, absolute, and complete control" over all fiscal affairs and credit policies of the corporate plaintiff. The contract also stated that, "should a default occur, either in this contract or those made contemporaneously

herewith, [Ross] shall have the authority, right and option to immediately take full and complete possession, custody and control of ALL properties in possession of [Walton]".

Ross did not assert his rights under this contract until June 1968. At that time, after having made additional advances to Walton and having suffered consistent defaults on Walton's part, Ross took control of Walton Motor Sales. On June 27, Ross, voting the Walton shares that had been pledged to him, elected a new board of directors for the company. Ross elected himself Chairman of the Board. On July 2, the new board elected Ross president and demoted George Walton from president to vice-president. On August 14, the board elected Ernest Schleusener, a business associate of Ross, executive vice-president.

Ross attempted briefly and unsuccessfully to resuscitate the plaintiffs' failing business. With the participation of George Walton, Ross and Schleusener operated the dealership for approximately six months. By the end of the year, however, Ross decided to liquidate the business.[4] On January 18, 1969, the individual plaintiffs executed an agreement acknowledging the defendant's right to foreclose on all security agreements held by him. Most of Walton's existing inventory of new and used cars had been sold between November 1968 and February 1969. Ross sold all of the remaining inventory and personal property (excluding certain items of equipment, such as the bowling alley and skating rink equipment) in a public auction on February 5. William Darby, an attorney acting as "mutual trustee" for Ross and Walton, auc-

---

**2.** The trial judge, Chief Judge Alexander Lawrence, tried this nonjury case from June 15 through June 17, 1977, but he died before rendering a decision. The case was then reassigned.

**3.** Ross acquired a security interest in the land through several transactions conducted between December 23, 1964, and May 20, 1965; he obtained security interests in Walton's inventory and personal property through a series of transactions, the last of which occurred on November 18, 1968. The details of the various transac-

tions through which Walton became indebted to Ross and through which Ross acquired security interests in Walton's assets are not relevant to the issues raised in this appeal.

**4.** George Walton was discharged from his position as vice-president on November 22, 1968. On November 29, Ross granted George Walton an option to purchase all of the assets of Walton Motor Sales. George Walton did not exercise this option.

tioned off the three tracts of real estate and the remaining items of equipment on March 4. Acting in accordance with Georgia statutory procedure,[5] Darby later obtained a state court's confirmation and approval of the real estate foreclosure sale.

The plaintiffs filed suit against Ross and Schleusener on April 8, 1971. The complaint alleged that the proceeds from the liquidation of Walton Motor Sales exceeded the amount of the debts secured by the property sold, and that Ross was liable to the plaintiffs for the resulting surplus. The complaint also charged Ross and Schleusener with illegally seizing control of the plaintiffs' business and maliciously destroying that business. Ross counterclaimed for alleged deficiencies from the sale of Walton's assets.

On June 27, 1973, the district court entered an order granting partial summary judgments to both the plaintiffs and the defendants. The court ruled that Ross owed Walton a surplus from the real estate foreclosure sale, but that an accounting would be necessary to determine the amount owed. The court then held that Walton was liable to Ross for a deficiency resulting from the sales of inventory and personal property; as with the surplus, however, an accounting would be necessary to determine the amount of the deficiency. The court granted summary judgment to the defendants with respect to the allegation of intentional destruction of the plaintiffs' business. Order on Motions for Summary Judgment, S.D. Ga. June 27, 1983, 2 Record 477.

After the death of the trial judge, the case was reassigned to another district judge, who referred it to a special master. The special master reviewed the record and issued two orders resolving the parties' factual and legal contentions. Report of Special Master for Accounting and Computation, S.D. Ga. Feb. 19, 1982, 3 Record 899; Supplement to Report of Special Master for Accounting and Computation, S.D. Ga. June 24, 1982, 3 Record 936. The special master determined that the surplus from the real estate foreclosure sale amounted to $236,815.33 and that the total deficiency from the sales of personal property and inventory came to $149,574.12.[6] The district court adopted all of the factual findings and legal conclusions of the special master,[7] offset the surplus by the deficiency, and entered judgment for the plaintiffs for $87,241.21. Order for Entry of Judgment, S.D. Ga. Sept. 21, 1982, 3 Record 941. Both Ross and the plaintiffs have appealed that judgment.

## II. ISSUES ON APPEAL

The defendant alleges that the district court committed three errors. First, Ross contends that the court erred legally and factually in reaching its determination concerning the amount of the proceeds from the real estate foreclosure sale. Second, Ross contends that the court erred in deciding that the defendant did not pay Darby a trustee's fee for his work in arranging and conducting that foreclosure sale. Third, Ross contends that the court erred in holding that he could not recover payments made on Walton's behalf under the authority of the "Contract as to Fiscal and Credit Policy Controls". We reject the first two contentions and accept the third.

The plaintiffs allege two errors in the district court's judgment. First, the plaintiffs argue that the court should have awarded them prejudgment interest on all or part of the surplus from the real estate foreclosure sale. Second, the plaintiffs assert that the defendant did not account for his disposition of Walton's personal property and inventory in sufficient detail to recover a deficiency judgment on the sale of

---

5. *See* Off. Code Ga. Ann. § 44–14–161 (1982).

6. The $149,574.12 total deficiency comprised two components: (1) $89,807.68—the net deficiency from the sales of personal property and inventory; and (2) $59,766.44—the sum of various advances, interest, and attorney's fees.

7. Because the district court adopted all of the reasoning and conclusions of the special master, in this opinion we refer to both the court and the master as "the district court".

those assets. We reject the first argument and accept the second.

## III. ANALYSIS

### A. Proceeds from the Real Estate Foreclosure·Sale

A major issue at trial concerned the amount of the proceeds from the real estate foreclosure sale conducted on March 4, 1969. The plaintiffs contended that the three tracts of land sold for $597,672.16 and that various items of equipment [8] located within buildings on the land sold separately for $61,000, thus bringing the total proceeds from the sale to $658,672.16. Ross argued that the equipment was sold along with the tracts of land and, therefore, that any proceeds from the sale of the equipment were included in the $597,672.16 bid on the land. The district court resolved this issue in favor of the plaintiffs. The defendant now mounts two arguments to attack that holding. We do not find either argument persuasive, and we affirm the district court's holding.

▮▮▮ Ross asserts that the judicial confirmation of the foreclosure sale operates as res judicata to bar the plaintiffs from litigating the amount of the proceeds from that sale. Georgia law requires judicial approval of foreclosure sales of real estate as a condition precedent to any action for a

deficiency judgment. Off. Code Ga. Ann. § 44–14–161(a) (1982). Before approving the sale, the court conducting the confirmation proceeding must determine that the property sold brought its true market value; the court must also determine that the creditor gave timely notice of the sale to the debtor and that the creditor advertised and conducted the sale fairly. Id. § 44–14–161(b), (c).[9] Darby's application for confirmation of the March 4 sale stated that the total amount bid on the three tracts of land was $597,672.16. The plaintiffs' answer to the application admitted that the land brought its fair market value. The Superior Court of Toombs County, Georgia, to whom the application had been submitted, held that the land brought its true market value and approved the sale. Ross argues that this holding is res judicata as to the amount of proceeds from the foreclosure sale.[10]

We disagree. Georgia's statutory confirmation proceeding is extremely limited in scope. The sole purpose of the proceeding is to determine that the sale of real estate was properly advertised and conducted and that the land brought its true market value. The confirmation court cannot consider issues between the parties that do not relate to the value of the *land*, the amount that the *land* brought, or the fairness of the procedures followed.[11] The statute

---

**8.** These items included bowling alley and roller rink equipment, shop equipment, an air conditioning system, and a paging system.

**9.** "(a) When any real estate is sold on foreclosure, without legal process, and under powers contained in security deeds, mortgages, or other lien contracts and at the sale the real estate does not bring the amount of the debt secured by the deed, mortgage, or contract, no action may be taken to obtain a deficiency judgment unless the person instituting the foreclosure proceedings shall, within 30 days after the sale, report the sale to the judge of the superior court of the county in which the land is located for confirmation and approval and shall obtain an order of confirmation and approval thereon.

"(b) The court shall require evidence to show the true market value of the property sold under the powers and shall not confirm the sale unless it is satisfied that the property

so sold brought its true market value on such foreclosure sale.

"(c) The court shall direct that a notice of the hearing shall be given to the debtor at least five days prior thereto; and at the hearing the court shall also pass upon the legality of the notice, advertisement, and regularity of the sale. The court may order a resale of the property for good cause shown."
Off. Code Ga. Ann. § 44–14–161 (1982).

**10.** Although the confirmation proceeding is summary in nature, the ensuing judgment cannot be attacked collaterally. *Teri-Lu, Inc. v. Georgia R.R. Bank & Trust Co.*, 1978, 147 Ga. App. 860, 250 S.E.2d 548, 550.

**11.** *See Weems v. McCloud*, 5 Cir.1980, 619 F.2d 1081, 1086; *Alexander v. Weems*, 1981, 157 Ga. App. 507, 277 S.E.2d 793, 794; *Harris & Tilley, Inc. v. First Nat'l Bank*, 1981, 157 Ga.App. 88, 276 S.E.2d 137, 141; *Hamilton Mortgage Corp. v. Bowles*, 1977, 142 Ga.App. 882, 237 S.E.2d 198,

does not apply to sales of personalty, and the confirmation court is without authority to address matters concerning sales of personalty, even if they are related to the sale of realty. *Gordon v. Weldon,* 1980, 154 Ga.App. 531, 268 S.E.2d 796, 796–97; *see Hinson v. First National Bank,* 1965, 221 Ga. 408, 144 S.E.2d 765, 768. Consequently, the issue whether the various items of equipment were sold separately or were included in the sale of the three tracts of land is not an issue that the confirmation court actually addressed or could have addressed. Because collateral estoppel and res judicata preclude relitigation only of issues that were or could have been decided previously,[12] the confirmation court's holding does not have either collateral estoppel or res judicata effect on the district court's consideration of the issue.

■ Ross asserts that, even if the confirmation of the foreclosure sale does not bar consideration of the proceeds issue, the evidence shows that the district court was clearly erroneous[13] in resolving this issue in favor of the plaintiffs. We reject this position. The evidence on this issue is conflicting. As the defendant acknowledges, there is substantial evidence supporting the district court's resolution of the issue. The defendant's arguments concerning the weight and credibility of various witnesses' testimony are arguments generally left for the district court to pass upon. We see no basis for finding the

court's holding on this issue clearly erroneous. We therefore affirm that holding.

### B. Trustee's Fee

■ Ross contends that Darby received a trustee's fee of $29,883.50 for arranging and conducting the real estate foreclosure sale, and that Ross should be allowed to deduct this fee from the proceeds of the sale. Ross argues that the district court erred in deciding, as a factual matter, that Darby did not receive a trustee's fee for this work.

The defendant's argument is meritless. The evidence supports the conclusion of the district court. Darby himself testified that he did not receive a trustee's fee, and the correspondence upon which Ross relies is ambiguous on this issue.[14] The district court's finding that Darby did not receive a trustee's fee is certainly not clearly erroneous.

### C. Payments Made Under the Fiscal Controls Contract

The district court held that Ross could not charge the plaintiffs for certain payments (totaling $121,843.05) that Ross made on behalf of Walton Motor Sales under the authority of the "Contract as to Fiscal and Credit Policy Controls" (Fiscal Controls Contract). The basis for this holding is that the contract is void under the doctrine of *Milton Frank Allen Publications, Inc. v. Georgia Association of Petroleum Retailers, Inc.,* 1968, 224 Ga. 518,

---

200; *Scroggins v. Harper,* 1976, 138 Ga.App. 783, 227 S.E.2d 513, 514; *see also Weems v. McCloud,* 619 F.2d at 1091; *Harris & Tilley v. First Nat'l Bank,* 276 S.E.2d at 140; *Walker v. Northeast Prod. Credit Ass'n,* 1978, 148 Ga.App. 121, 251 S.E.2d 92, 93; *Shantha v. West Ga. Nat'l Bank,* 1978, 145 Ga.App. 712, 244 S.E.2d 643, 644.

**12.** Collateral estoppel bars relitigation of any particular legal or factual issue that was necessarily litigated and actually decided in a previous suit. *E.g., International Ass'n of Machinists & Aerospace Workers v. Nix,* 5 Cir.1975, 512 F.2d 125, 131–32; *Chilivis v. Dasher,* 1966, 236 Ga. 669, 225 S.E.2d 32, 34. Res judicata bars relitigation of all matters that could have been put in issue in a previous suit involving the same cause of action between the same parties or those in

privity with them. *E.g., Nix,* 512 F.2d at 131; *McBride v. Chilivis,* 1979, 149 Ga.App. 603, 255 S.E.2d 80, 81; Off. Code Ga. Ann. § 9–12–40 (1982).

**13.** The "clearly erroneous" standard applies to review of a special master's findings of fact. Fed.R.Civ.P. 53(e)(2).

**14.** In a letter dated April 16, 1969, Darby billed Ross $29,883.50 as a trustee's fee for the foreclosure sale. In a letter dated April 21, Ross objected both to the trustee's fee and to a separate bill (apparently in the amount of $94,329.30) for Darby's legal services. The two men eventually agreed on an "overall bill" of $60,000, which represented Ross's payment to Darby for "the whole ball of wax". *See* 3 Record 718–22.

162 S.E.2d 724, *cert. denied*, 1969, 393 U.S. 1025, 89 S.Ct. 636, 21 L.Ed.2d 569.[15] Because the district court's rationale is defective, we reverse the court's holding on this issue.

Georgia law has long maintained that a party cannot recover money paid under a contract that is contrary to public policy and therefore void.[16] In *Milton Frank Allen*, the Georgia Supreme Court held a contract void for the reason that it divested the directors of a corporation of their authority and discretion over an important area of corporate policy: "[T]he control and direction of corporate affairs, business and management ... is vested in [the directors] by law..... [A]n agreement by which the individual directors, or the entire board abdicate or bargain away in advance the judgment which the law contemplates they shall exercise over the affairs of the corporation is void." 162 S.E.2d at 730 (quoting 17 C.J.S. *Contracts* § 199, at 994–95 (1963)).

In the Fiscal Controls Contract, the individual plaintiffs (then directors of Walton Motor Sales) granted Ross "full, absolute, and complete control" over all fiscal affairs and credit policies of the corporate plaintiff. This feature of the contract abrogates the independent decisionmaking authority of the directors of the corporation over an important area of corporate policy. Nonetheless, the contract does not fall within the doctrine of *Milton Frank Allen*.

The foundation of the *Allen* court's determination that the contract there was contrary to public policy was that the contract contravened section 22–1864 of the Georgia Code. *See* 162 S.E.2d at 730. The current version of that statutory provision is expressed in section 14–2–140 of the Code, which states:

"*Subject to* the provisions of the articles of incorporation, the bylaws, or *agreements between the shareholders* which are otherwise lawful, the business and affairs of a corporation shall be managed by a board of directors."

Off. Code Ga. Ann. § 14–2–140(a) (1982) (emphasis added). Nothing in Georgia law renders it unlawful for the shareholders of a close corporation, who are also the directors and officers of the corporation, to divest themselves of ultimate control over the fiscal and credit policy of the corporation. To the contrary, the Georgia Code expressly sanctions this type of arrangement:

"Except in cases where the shares of the corporation are listed on a national securities exchange or generally traded in the markets maintained by securities dealers or brokers, no written agreement to which all the shareholders have actually assented, whether embodied in the articles of incorporation or bylaws or in any agreement in writing signed by all the parties thereto, which agreement relates to any phase of the affairs of the corporation, whether to the management of its business or to the division of its profits or otherwise, shall be invalid as between the parties thereto on the ground that it is an attempt by the parties thereto to restrict the discretion of the board of directors in its management of the business of the corporation...."

**15.** The special master believed that District Judge Lawrence had held the contract to be unenforceable in the court's order of June 27, 1973. *See* Report of Special Master for Accounting and Computation, p. 9, S.D.Ga. Feb. 19, 1982, 3 Record 899, 907. In fact, Judge Lawrence's order only implies that he considered the contract void; the order reaches no such holding. *See* Order on Motions for Summary Judgment, pp. 16–18, S.D.Ga. June 27, 1973, 2 Record 477, 492–94. For purposes of deciding this issue on appeal, we treat the special master's interpretation of Judge Lawrence's order as the holding of the district court.

**16.** *Hanley v. Savannah Bank & Trust Co.*, 1952, 208 Ga. 585, 68 S.E.2d 581, 582; *Dorsett v. Garrard*, 1890, 85 Ga. 734, 11 S.E. 768, 770; *Jones v. Faulkner*, 1960, 101 Ga.App. 547, 114 S.E.2d 542, 544; *Thompson v. Ledbetter*, 1946, 74 Ga.App. 427, 39 S.E.2d 720, 721; *Deaton v. Johnson*, 1945, 72 Ga.App. 571, 34 S.E.2d 558, 559; *see Fender v. Crosby*, 1953, 209 Ga. 896, 76 S.E.2d 769, 771–72.

*Id.* § 14–2–120(b).[17] Because the individual plaintiffs were the sole shareholders of Walton Motor Sales when they executed the Fiscal Controls Contract, and because they executed the contract in their capacity as shareholders, the contract does not contravene section 14–2–140(a). Accordingly, the contract is not void under the doctrine of *Milton Frank Allen.*

■ The district court erred in holding that Ross could not charge the plaintiffs for payments made under the authority of the contract. We reverse that holding and direct the district court, on remand, to credit Ross for these payments.[18]

### D. Prejudgment Interest

The plaintiffs assert that they are entitled to prejudgment interest on all or part of the surplus resulting from the real estate foreclosure sale. We disagree.

■ Under Georgia law,

"All liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them ...."

Off. Code Ga. Ann. § 7–4–15 (1982). A debt is "liquidated" if it is *certain* and *fixed,* either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof; it is so much, or nothing ...." *Nisbet v. Lawson,* 1846, 1 Ga. 275, 287; *accord, e.g., Erickson's, Inc. v. Travelers Indemnity Co.,* S.D.Ga.1971, 330 F.Supp. 380, 381–82, *aff'd,* 5 Cir.1972, 454 F.2d 884, *cert. denied,*

409 U.S. 847, 93 S.Ct. 51, 34 L.Ed.2d 87; *B.G. Sanders & Associates v. Castellow,* 1980, 154 Ga.App. 433, 268 S.E.2d 695, 697. Even if a party has admitted the fact of liability, if the amount of liability is not fixed and certain the debt is not "liquidated". *Merchants Insurance Co. v. Lilgeomont, Inc.,* 5 Cir.1936, 84 F.2d 685, 689–90; *Firemen's Insurance Co. v. Oliver,* 1936, 182 Ga. 212, 184 S.E. 858, 859.

■ In the present case, the amount of the surplus (if any) from the foreclosure sale on Walton's real estate was in dispute throughout the course of litigation. It was the subject of conflicting testimony, which was resolved only by the final decision of the district court. As the district court held, the surplus figure clearly does not fall within the concept of "liquidation" under Georgia law.

The plaintiffs challenge this straightforward conclusion on two grounds, both of which are unavailing. First, the plaintiffs argue that the disagreement concerning the size of the surplus was generated solely by a dispute over the total amount of proceeds from the foreclosure sale—i.e., whether that figure was $658,672.16 or $597,672.16. The plaintiffs assert that Ross fabricated this issue, that there was no bona fide dispute with regard to the amount of proceeds, and that the surplus should therefore be considered a liquidated sum.

■ We cannot accept this argument. It is true that a person cannot render a liquidated figure unliquidated by at-

---

**17.** Subsection (b) of § 14–2–140 protects third parties who deal with corporations whose boards possess limited authority:

"No limitation upon the authority which the directors would have in the absence of such limitation, whether contained in the articles of incorporation, bylaws, or otherwise, shall be effective against persons, other than shareholders and directors, who are without actual knowledge of such limitation."

Off. Code Ga. Ann. § 14–2–140(b) (1982).

**18.** The plaintiffs assert that the contested payments do not fall within the scope of the Fiscal Controls Contract, because these payments were related to the liquidation of the corporation rather than to its management. This argument

rests upon an untenable construction of the contract. The contract provides that Walton "agrees to pay to [Ross] all costs, expenses and salaries of not only [Ross] but also his agent(s) and/or representative(s) as may be incurred in the carrying out of the performance of this contract". The contract states that Ross may take possession of all of Walton's assets should Walton be guilty of a default, and the contract incorporates other agreements between the parties that provide for Ross's foreclosure on Walton's property in the event of default. The contract thus expressly contemplates the possibility that Ross may expend funds liquidating the assets of the corporation.

tacking the size of the figure in bad faith. *See Ryan v. Progressive Retailer Publishing Co.*, 1915, 16 Ga.App. 83, 84 S.E. 834, 835–36; *cf. Buck Creek Industries v. Crutchfield & Co.*, 1974, 133 Ga.App. 80, 210 S.E.2d 32, 33.[19] But the determination whether there is a bona fide dispute between the parties is a matter that Georgia law commits to the factfinder. *Ryan*, 84 S.E. at 836. Although the district court did not explicitly address this question, its reasoning on the general issue of prejudgment interest clearly implies that it considered the dispute over the amount of the proceeds to be a bona fide dispute. *See* Supplement to Report of Special Master for Accounting and Computation, S.D.Ga. June 24, 1982, 3 Record 936, 936–37.

■ A more fundamental defect in the plaintiffs' argument is that it overlooks the fact that the parties also disputed the amount of indebtedness secured by the real estate. Estimates of this figure varied considerably throughout the course of the litigation. The parties settled the question somewhat by stipulation. *See* Stipulation of Undisputed Facts and of Factual and Legal Issues Remaining for Resolution, Apr. 28, 1977, 3 Record 727. This agreement stipulated that the total net indebtedness secured by the real estate was either $389,582.15 or $421,313.78, depending on whether Ross could charge Walton interest on delinquent installment payments. *See id.* at 4–5, 3 Record at 730–31. The stipulation was subject, however, to two significant qualifications: (1) Ross contended that, under the terms of the security agreement concerning the real estate, the total indebtedness should include a sum representing the fair rental value of the property over the life of the security agreement; and (2) Ross contended that advances he made for the maintenance of the property should be included in the total indebtedness. *See id.* at 2–3, 5, 3 Record at 728–29, 731. The stipulation, therefore, did *not* settle the net indebtedness secured by the real estate. Consequently, even if there was no bona fide dispute over the amount of the proceeds, the amount of the surplus was at issue until determined by the district court.

■ The plaintiffs argue in the alternative that they are entitled to prejudgment interest on part of the surplus. Their argument is that, because Ross contended that the proceeds were $597,672.16 and stipulated that the secured indebtedness was $389,582.15, he effectively admitted that he was liable for $208,090.01. The plaintiffs contend that they should receive prejudgment interest at least on this amount.[20] This argument suffers from the same defect as does the plaintiffs' other argument on this issue: It assumes that the parties had settled by stipulation the amount of secured indebtedness. As we have noted above, this is not the case.[21]

The plaintiffs' attempts to characterize all or part of the surplus as a liquidated

**19.** Additionally, a liquidated debt does not become unliquidated simply because it may be offset by unliquidated credits. *See Bassett Furniture Indus. v. NVF Co.*, 5 Cir.1978, 576 F.2d 1084, 1093; *Recordex Corp. v. Southeastern Metal Prods.*, 1978, 147 Ga.App. 79, 248 S.E.2d 159, 159–60; *Buck Creek Indus. v. Crutchfield & Co.*, 1974, 133 Ga.App. 80, 210 S.E.2d 32, 33–34; *Haygood v. Smith*, 1949, 80 Ga.App. 461, 56 S.E.2d 310, 314. This line of authority is not relevant to the present appeal. Here, the parties have disputed, as an initial matter, the amount owing to Walton from the real estate foreclosure sale; there was no agreed-upon surplus subject to contested credits.

**20.** If a defendant admits liability in some amount—not necessarily the amount claimed or ultimately recovered by the plaintiff—the plaintiff may receive interest on the amount admitted from the date of the admission. *Boston-Old Colony Ins. Co. v. Warr*, 1972, 127 Ga.App. 364, 193 S.E.2d 624, 625; *Firemen's Ins. Co. v. Oliver*, 1936, 53 Ga.App. 638, 186 S.E. 706, 708; *see Erickson's, Inc. v. Travelers Indem. Co.*, S.D.Ga. 1971, 330 F.Supp. 380, 382, *aff'd*, 5 Cir.1972, 454 F.2d 884, *cert. denied*, 409 U.S. 847, 93 S.Ct. 51, 34 L.Ed.2d 87. *But see Ryan v. Progressive Retailer Publishing Co.*, 1915, 16 Ga.App. 83, 84 S.E. 834, 836.

**21.** Besides the defendant's two qualifications to the stipulation, the plaintiffs' arithmetic also fails to take account of the disputes over (1) interest on delinquent installments, (2) the filing fee for the confirmation of the foreclosure sale, and (3) the trustee's fee allegedly paid to Darby.

sum are misguided. The district court correctly concluded that the figure was unliquidated. Its refusal to award the plaintiffs prejudgment interest was proper.

### E. Sufficiency of the Accounting

The district court held that Ross had established that the debt secured by Walton's inventory and personal property exceeded the proceeds from the sale of this property by $89,807.68. The plaintiffs argue that Ross did not render an accounting of his disposition of these assets in sufficient detail to entitle him to a deficiency judgment. We agree with the plaintiffs, and we reverse the district court's holding on this issue.

 Under Georgia law, when a creditor asserts control over a debtor's assets, disposes of these assets to satisfy the debt, and then seeks to recover a deficiency judgment, the creditor must make a detailed accounting of its disposition of the assets to sustain its burden of proving that there is a deficiency. In *Pethel v. General Finance & Thrift Corp.*, 1951, 83 Ga.App. 562, 63 S.E.2d 907, the plaintiff, a creditor, had taken possession of the inventory of the defendant car dealership and sold some of the cars to satisfy the defendant's secured debt to the plaintiff. The plaintiff's evidence did not establish exactly how many cars were sold, nor did it show the important details (date of sale, purchase price, and purchaser) of the individual sales. The Georgia Court of Appeals reversed a judgment for the plaintiff, holding that the plaintiff had not met its burden "to show in detail what the credits were".

63 S.E.2d at 910. *See also Newkirk v. Universal C.I.T. Credit Corp.*, 1955, 93 Ga.App. 1, 90 S.E.2d 618, 621; *Barrett v. Distributors Group, Inc.*, 1953, 89 Ga.App. 458, 79 S.E.2d 587, 589; *Barrett v. Distributors Group, Inc.*, 1952, 85 Ga.App. 529, 69 S.E.2d 810, 812.[22]

 The district court found that Ross had accounted for his disposition of all of Walton's personal property and inventory except for $21,502.35 worth of automobiles (the value of 12 cars that were not accounted for). The court credited the plaintiffs for this amount, and then held that Ross had met his burden of proof with regard to the remainder of the deficiency. The court's resolution of this issue is both factually and legally erroneous.

The district court's conclusion that Ross had accounted for all assets except for 12 automobiles is clearly erroneous. The court based this conclusion on the expert testimony of Gilbert Jones, a Certified Public Accountant hired by the defendant to trace the disposition of Walton's assets during the period of the defendant's control of the corporation. The thrust of Jones's testimony, however, is not that Ross had accounted for all but 12 automobiles; his testimony was that Ross was unable to account for *at least* 12 automobiles. *See* Testimony of Gilbert Jones, 5 Record 183. Throughout the course of his testimony, Jones bemoaned the inadequacy of the records upon which his analysis was founded, and he made several significant qualifications concerning the accuracy of his con-

---

**22.** These decisions predate the enactment of § 11–9–504 of the Georgia Code, which requires that, if a creditor disposes of collateral to satisfy a debt, "every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable". Off. Code Ga. Ann. § 11–9–504(3) (1982). We have found no indication that this statutory provision abrogates the *Pethel* doctrine. In fact, Georgia courts applying § 11–9–504 have required strict compliance with its mandate as a condition precedent to a creditor's recovery of a deficiency judgment. *See* the cases discussed in *Comfort Trane Air Conditioning Co. v. Trane Co.*, 5 Cir.1979, 592 F.2d 1373, 1386. A creditor seeking to recover a deficiency must prove that the proceeds from the sale of collateral equal the fair and reasonable value of the collateral. *Id.* at 1387. And if the creditor fails to establish that the debt exceeded the fair value of the collateral, the court presumes that they are equal. *Davis v. Ford Motor Credit Co.*, 1982, 164 Ga.App. 137, 296 S.E.2d 431, 432; *Richard v. Fulton Nat'l Bank*, 1981, 158 Ga.App. 595, 281 S.E.2d 338, 340; *Hubbard v. Farmers Bank*, 1980, 155 Ga.App. 720, 272 S.E.2d 510, 511, *aff'd*, 1981, 247 Ga. 431, 276 S.E.2d 622. Such proofs necessitate a detailed accounting of the creditor's disposition of the debtor's assets.

clusions.[23] He also acknowledged that his analysis of the period from July 1968 to November 30, 1968, included only the automobiles that were the subject of a financing agreement with a local bank. *See id.* at 147. Gilbert Bennett, the CPA who testified on behalf of the plaintiffs, attempted to reconstruct the disposition of Walton's stock of cars that were not covered by this financing agreement. He concluded that 22 of these cars disappeared between November 30 and February 5, 1969 (the date of the foreclosure sale on inventory and personal property). *See* Testimony of Gilbert Bennett, 5 Record 438.

The testimony of the two CPAs and of other witnesses brought out a number of irregularities in the keeping of records after Ross assumed control of Walton. Jones and Bennett both testified that, during this period, posting to the company's journals was incomplete, ledgers were out of balance, and funds were dispersed from and shifted among various bank accounts with inadequate documentation. According to other witnesses, there were various transactions for which Walton should have received credit, but for which the records do not show any credit. In short, the overall picture that the trial transcript presents does not come close to the detailed accounting required by *Pethel.*

The district judge believed that George Walton's continued participation in the operation of the dealership between July and November 1968 constituted a waiver of the plaintiffs' right to a detailed accounting of the defendant's disposition of assets during this period. In a similar vein, Ross argues that his inability to make a detailed accounting at trial was the result of George Walton's failure to maintain proper records during the relevant period. We reject both of these related positions. Although George Walton assisted in the operation of the company through November 1968, it is uncontested that Ross took

control of the company at the end of June and demoted George Walton to a subordinate position. Under *Pethel,* a creditor who takes such action and later seeks a deficiency judgment is responsible for ensuring that adequate records are maintained during the period of control. It is not sufficient that, at trial, Ross rendered the best accounting possible in the light of the poor state of recordkeeping. When a creditor assumes control over a debtor's assets, recordkeeping responsibility falls on the creditor's shoulders. If inadequacies in the records render it impossible later to make a detailed accounting, the creditor must bear the consequences.

The district court erred factually and legally in holding that Ross had accounted for his disposition of inventory and personal property in sufficient detail to recover any deficiency resulting from that disposition. Ross did not meet his burden of proof on this issue. We therefore reverse the district court's holding and remand with instructions to increase the judgment for the plaintiffs by $89,807.68, the amount of the net deficiency awarded to Ross.

## IV. CONCLUSION

We affirm all but two aspects of the district court's judgment. First, we reverse the court's holding that Ross could not recover payments made under the authority of the Fiscal Controls Contract. Our reversal of this holding requires that the district court decrease the plaintiffs' judgment by $121,843.05. Second, we reverse the court's conclusion that Ross had sufficiently accounted for his disposition of personal property and inventory. Our holding on this issue requires that the district court increase the plaintiffs' judgment by $89,807.68. Applying this arithmetic to the original judgment for the plaintiffs ($87,241.21) yields a net judgment for the plaintiffs in the amount of $55,205.84.

---

**23.** At one point, Jones stated that he might have "mixed up" five or six cars. Testimony of Gilbert Jones, 5 Record 117. Later, he acknowledged that accounting for the disposition of the proceeds from automobile sales was "a hit or miss proposition". *Id.* at 157. Finally, near the end of his testimony, Jones stated: "There'll just never be a full accounting." *Id.* at 184.

The holding of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED with instructions to enter judgment for plaintiffs in the amount of $55,205.84 plus interest from the date of the original judgment.