## 68673. MOULTRIE FARM CENTER, INC. v. SPARKMAN et al.

Deen, Presiding Judge.

From 1967 until the present, Ross Sparkman, his wife and two sons owned and operated Sparkman's Dairy. In July 1981, the dairy herd consisted of 227 Jersey cows (215 adult cows and 12 heifers). On that date, Mr. Sparkman sent one of his employees to Moultrie Farm Center, Inc. to pick up an order of 500 lbs. of bicarbonate of soda. The Farm Center employee to whom the order was submitted had difficulty locating the soda in the "drug or medication" room where it was normally stored and went into the "mill or mixing room" where feeds and drugs are mixed for distribution. The employee located what he believed to be two fifty-pound bags of soda. He called Mr. Sparkman and informed him that he had only two fifty-pound bags and Sparkman agreed to take the two bags. The bags were loaded on the truck by Farm Center employees along with some calf feed. Upon arrival at the dairy, the two bags were unloaded in the machine shed which did not have any artificial lighting. Ricky Sparkman had been notified by his father to expect two fifty-pound bags of soda instead of the usual 100-pound bags and he used one of them when he mixed the cows' feed by using a front-end loader in the dark shed.

The next day the second bag was mixed into the feed under similar lighting conditions. After the feeding on July 30, Sparkman noticed some of the cows appeared ill. The following day, some had diarrhea and appeared nervous. By August 1, two cows were down and one had died. None of the cows who received the mixed feed were eating, they had diarrhea, some had lost their intestinal lining, and the herd's milk production dropped from 3300 lbs. per day to 1100 lbs. per day. The veterinarian who was called diagnosed the cause of the herd's illness as arsenic toxicity. The evidence showed that the Farm Center employee had filled the soda order with two bags of arsanilic acid, an arsenic compound which is never fed to cows because it is highly toxic to their systems. It is fed to chickens and swine in minute amounts as a growth stimulant and as an aid to controlling diarrhea. The employee, a high school student, was hired to sweep up, stock shelves and take orders and had received no instruction in the dangers or hazards of any feed grain medications or additives, was not instructed as to the size or shape of bicarbonate of soda bags (it came only in 100-lb. bags) and was not instructed by the Farm Center as to their color-coding safety precautions. There was no warning on the bags of arsanilic acid and the contents were marked only on one side. There was also testimony by the Farm Center's general manager that the error in filling Sparkman's order should have been discovered by Friday, July 31, but was not because "their regular routine was out of place."

An expert witness for the plaintiff compared the milk production records of the 195 cows exposed to the contaminated feed and the 20 cows who were not exposed and testified as to the precipitous drop in production of the exposed cows and the production expectations of the heifers and compared it to their actual production after the incident. There was testimony that a total of 21 cows and 3 heifers died within the two-year period following the poisoning and that a total of 10 died within two months of the incident. The average death rate of the five years preceding the poisoning was .036% as compared to a rate almost four times higher afterwards. The culling rate of young heifers was also very high.

The local veterinarians confirmed the diagnosis of arsenic poisoning and stated they believed it was responsible for the increased death rate, increased abortion rate, and loss of milk production in the herd. The appellee's expert witness confirmed their diagnosis, but disputed the figures on loss of milk production and the increased long-term death rate. Sparkman testified he attempted to mitigate his production loss by purchasing 65 additional cows, but claimed they were not all of the quality he would have preferred.

Moultrie Farm Center brings this appeal from a judgment entered on a jury verdict in the amount of $275,000 following the denial of its motions for a judgment notwithstanding the verdict and for a new trial.

1. Appellant first contends the trial court erred in denying his motion for a judgment notwithstanding the verdict because the plaintiff, by exercising ordinary care, could have avoided the consequences caused by the defendant's negligence and relies upon Martin v. Bartell Drug Co., 284 P 96 (1930), to support his claim that plaintiff's employees had ample opportunity to inspect the bags and contents prior to using them and their failure to do so bars recovery by the plaintiff.

In ruling upon a motion for a judgment notwithstanding the verdict, the court must view the evidence in the light most favorable to the jury verdict, and issues of negligence, diligence, contributory negligence, cause and proximate cause are matters for jury decision, and the court should not substitute itself for the jury except in plain, palpable and indisputable cases. *Bryant v. Colvin*, 160 Ga. App. 442 (287 SE2d 238) (1981). See also *Church's Fried Chicken v. Lewis*, 150 Ga. App. 154, 159 (256 SE2d 916) (1979). "A judgment notwithstanding the verdict can be rendered only where the evidence demands a verdict contrary to the one returned by the jury." *Osborn v. Youmans*, 219 Ga. 476, 479 (134 SE2d 22) (1963). If there is any evidence to support the jury verdict, it is proper for the court to deny the motion. *Maloy v. Planter's Warehouse &c. Co.*, 142 Ga. App. 69, 72 (234 SE2d 807) (1977); *Moody v. Nides Finance Co.*, 115 Ga. App. 859 (1) (156

SE2d 310) (1967).

In the instant case, the defendant's employees loaded the supplies on Sparkman's truck and Sparkman had been informed by appellant that he should expect to receive his order in two fifty-pound bags instead of the usual 100-pound bags. The dark misty weather conditions and the lighting conditions in the shed when the truck was unloaded and when the feed was mixed were adequately presented so as to require jury resolution as to the defendant's negligence. As the jury was fully instructed on this issue, we find no merit in appellant's position.

2. This court does not consider the weight of the evidence as that issue addresses itself only to the trial judge in ruling upon the defendant's motions. *Ridley v. State*, 236 Ga. 147, 149 (223 SE2d 131) (1976); *Hembree v. Ideal Bldrs.*, 158 Ga. App. 574 (281 SE2d 328) (1981).

3. Appellant assigns error to the trial court's charge that the jury might award damages for lost profits.

The plaintiff presented evidence that the dairy had been a profitable ongoing business since 1967 and produced evidence based on his business records and the testimony of an expert who examined the milk production records to show that he had one of the finest dairy herds in the state prior to the poisoning incident. The expert examined the milk production records to show that the cows remaining in the herd after the incident were producing milk at a much lower rate than before. Any cows that died, were sold, or removed from the herd were not included in the loss of production estimates.

There is a general rule that business profits which are too uncertain or speculative to afford a basis for compensation cannot be considered. However, "where the type of business and history of profits make the calculation of profits reasonably ascertainable, evidence of lost profits may be considered." *Claxton Poultry Co. v. City of Claxton*, 155 Ga. App. 308, 313 (271 SE2d 227) (1980); *Atlanta Gas &c. Co. v. Newman*, 88 Ga. App. 252, 253 (76 SE2d 536) (1953). Appellant's reliance upon *Radlo of Ga. v. Little*, 129 Ga. App. 530 (199 SE2d 835) (1973), and *Bennett v. Smith*, 245 Ga. 725 (267 SE2d 19) (1980), is misplaced. In the former case, the plaintiff proved no loss of profits from an ongoing business because he was operating at a loss and there was no basis for judging future performance. In *Bennett*, the business was a new business without any proven history of profits.

In this case, Sparkman submitted his dairy records dating from 1967 to the present to prove the business had a history of making a profit. Evidence as to previous production of the dairy, price of milk per pound, expenses, the anticipated lost profits, valuation and production comparison between the exposed and unexposed portions of the herd and lack of change in management or personnel were

presented to the jury. We find no error.

4. Appellant's contention that it was error to deny his motion for a new trial because the verdict was excessive is based on the argument that a verdict of $275,000 is excessive because Sparkman testified the value of the entire herd less salvage value was $237,773 and his own expert placed the value at $254,775 without an allowance for salvage value. This argument overlooks appellee's full claim for damages, which included not only the decrease in value of the exposed part of the herd, but also the loss of nine calves which were aborted, the loss of sale value of 52 cows, the loss of production resulting in lost profits, veterinary expenses, and the travel and lodging expenses Sparkman incurred in buying replacement cows. Sparkman testified his total damages amounted to $399,815.39.

OCGA § 51-12-12 (Code Ann. § 105-2015) provides: "The question of damages is one for the jury, and the court should not interfere with the jury's discretion unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias." We find no abuse of the trial court's discretion in approving a verdict which has ample evidence to support it and that the damages are not so excessive as to authorize an inference of gross mistake and undue bias. *Brown v. Service Coach Lines*, 71 Ga. App. 437, 447 (31 SE2d 236) (1944). Where "[t]he jury's verdict was within the range of the testimony, the evidence was sufficient to afford a basis for a jury decision, and the award was not so excessive of the relief sought as to indicate bias or prejudice on the part of the jury," this court will not disturb it. *Hubacher v. Volkswagen Central*, 164 Ga. App. 791, 795 (298 SE2d 533) (1982); *Horne v. Claude Ray Ford Sales*, 162 Ga. App. 329, 330 (290 SE2d 497) (1982). In his pleadings, appellant sought $350,000 in general damages and $35,000 special damages, and testified as to $399,815.39 in damages. We find that the jury verdict was not excessive.

5. The trial court did not err in permitting two expert witnesses to testify in response to a hypothetical question which appellant contends requested the witnesses to assume a fact not in evidence, namely, that within two months of the poisoning ten cows had died. When asked if he could determine from his records how many cows had died in the first two months after the incident, Sparkman replied that he could, although his report does not end in exactly two months because it ended on October 15 (75) days, which would be the nearest he could get. His response to the question after looking at his records was that ten head died. Deal, a witness for the defendant, verified this figure after reviewing the records and testified on two occasions that nine cows and one heifer died in August and September and, referring to the heifer, stated, "that cow died too." We find no error in the trial court's decision to overrule the objection to the hypothetical.

6. Appellant contends that the trial court erred in allowing Sparkman to testify over objection as to his veterinary bills for the two years prior to trial without tying specific items to the poisoning incident or showing that they all arose out of this incident.

The transcript shows there was no way to determine how much arsenic each cow received. The attending veterinarian post-mortemed several of the animals which died shortly after becoming ill from the feed and diagnosed the cause of death as arsenic toxicity. He stopped doing post-mortems because animals which died after the first few days would not clearly show arsenic in their systems because it is excreted within a few days. He was of the opinion, however, that the majority of cows who died within the first 41 days died from the secondary effects of arsenic. Sparkman's regular veterinarian was out of town when the incident occurred, but assisted in the treatment of the cows as soon as he returned. He testified that even after arsenic is eliminated by the cows, there is damage to the intestinal tract. A toxicologist who specialized in arsenic research testified that injuries would continue after a cow eliminated the arsenic and that the animal could be left badly damaged with various injured organs. Because of the nature of the injuries suffered by the cows, there is no way to prove whether the illness or injuries sustained by a cow exposed to arsenic was caused by the secondary effects of arsenic or by some other agent. The court therefore permitted the plaintiff to introduce his veterinarian and medication bills for the two years prior to the poisoning for comparison with the bill for the two years afterwards and permitted the difference between the two bills, after proper adjustment was made for nonexposed cows, to be the amount claimed in damages.

A jury must be able to calculate the amount of damages from the data furnished and it cannot be placed in a position where an allowance of loss is based on guesswork. *Roland v. Byrd*, 163 Ga. App. 408, 410 (294 SE2d 626) (1982). A jury must be able to calculate loss with a reasonable certainty. *DeJong v. Stern*, 162 Ga. App. 529 (292 SE2d 115) (1982). The party claiming damages carries not only the burden of proving the damages, but also furnishing the jury with sufficient data to estimate the damages with reasonable certainty. "It is not necessary, however, that the party on whom the burden thus rests should submit exact figures." *Nat. Refrigerator &c. Co. v. Parmalee*, 9 Ga. App. 725 (1) (72 SE 191) (1911). We find that the plaintiff adequately presented his claim for veterinary services and medication as his evidence provided the jury with a method of reasonably determining the cost of treatment for the cows which were poisoned.

7. In his remaining enumerations, appellant claims the court erred in failing to give his fourth request to charge in the language requested and that the court erred in charging, "thus, if you find that

the plaintiffs are entitled to recover in this case, but that they could have minimized their damages, if any, by purchasing substitute cows, then you'll not be authorized to award damages for lost cows exceeding the value of such replacement cows."

The court refused to give the defendant's requested charge in precisely the language requested because "it would seem to exclude consideration of any damages of any kind except the value of those cows which were replaced. And I put for the lost cows exceeding the value of such replacement cows as being the interpretation I thought might be justified." We find the evidence justified the charge as given. Another portion of the charge informed the jury of the plaintiff's duty to mitigate his damages. We find no error.

*Judgment affirmed. McMurray, C. J., and Sognier, J. concur.*

DECIDED JULY 12, 1984 —
REHEARING DENIED JULY 24, 1984 —

*James C. Whelchel,* for appellant.
*Michael A. Sherling,* for appellees.