**Lewis J. McDERMOTT, III and Criterion Mills, Inc., Plaintiffs-Appellants,**

**v.**

**MIDDLE EAST CARPET COMPANY, ASSOCIATED, Defendant-Appellee.**

No. 86–8125.

United States Court of Appeals, Eleventh Circuit.

March 6, 1987.

John T. Avrett, Dalton, Ga., for plaintiffs-appellants.

Kirk W. Watkins, Atlanta, Ga., for defendant-appellee.

Before FAY and JOHNSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

This appeal challenges the propriety of damages awarded in a contract dispute.

The parties were involved in the construction of a carpet factory in Egypt. Criterion Mills, Inc. (hereinafter CMI) and Lewis J. McDermott, III brought suit against the Middle East Carpet Company (hereinafter MECCA) seeking damages for breach of contract, restitution of funds paid as a bonus, reimbursement of losses sustained from the resale of raw materials, and a declaration of the fair market value of an equity interest in MECCA. MECCA counterclaimed, seeking damages for neglect of corporate duty and breach of contract. The District Court for the Northern District of Georgia adopted a special master's recommendation awarding CMI $9,964.00 for losses sustained by the resale of manufacturing materials, but denying all the other claims advanced by CMI and McDermott. Regarding MECCA's counterclaim, the district court adopted the special master's recommendations awarding $845,194.40 for lost profits, $20,000 for misappropriated funds, $21,000 in interest, and $35,302.00 for the loss of investment return on the value of certain raw materials which sat idle for eight months. CMI and McDermott argue on appeal that (1) the evidence was too speculative for an award of lost income; (2) the district court applied an inappropriate rate of interest; and (3) the court erroneously declined to declare a MECCA equity interest in favor of McDermott. For the reasons that follow, we affirm the district court's order with respect to lost profits and the refusal to declare an equity interest, but modify the portion of the order awarding interest and reverse the award for loss of investment return with respect to the funds used to purchase raw materials.

## I.

### BACKGROUND

A. *Facts*

In the early seventies, several members of the Royal Family of Kuwait pondered the possibility of establishing a tufted carpet[1] factory in the Middle East. In accord-

---

1. Tufted carpet, made by attaching clusters of yarn threads to mesh backing, produces a surface of raised tufts or cut pile.

ance with this objective, the Kuwaiti businessmen formed MECCA, a Kuwaiti limited liability Company. Sheikh Ali Sabah Al-Salem Al-Sabah of the Royal Family (hereinafter Sheikh Ali) retained the services of Mahmoud El Farra (hereinafter El Farra) to conduct a feasibility study of the proposed business venture. In order to gather information about the production of tufted carpet, El Farra contacted McDermott, an experienced businessman in the carpet industry. At the time, McDermott was serving as the chief executive officer and Chairman of the Board of Directors of CMI—a manufacturer of tufted carpet in Cartersville, Georgia.

After discussing the contingent enterprise with El Farra, McDermott met several times with Sheikh Ali. On January 28, 1976, the two gentlemen reached an agreement concerning the construction of a carpet manufacturing plant under McDermott's supervision and management. According to the terms of the contract signed by McDermott on behalf of CMI and Sheikh Ali on behalf of MECCA, CMI was obligated to supervise the construction of the facility, prepare specifications, purchase machinery and raw materials, and assist in marketing and sales.

Simultaneous with the execution of the management agreement, McDermott subscribed to ten percent of the shares of MECCA stock. These shares were financed through and pledged as security to the Kuwait Financial Center (hereinafter KFC). McDermott owed approximately $400,000 in principal to the KFC. $120,000 of this amount was to be paid from advances by MECCA to McDermott. The remaining principal plus interest was to be paid from McDermott's personal funds.

MECCA officials chose Alexandria, Egypt for the location of the factory. Egypt was perceived as an ideal location because of a promising Middle East market and the ready availability of raw materials produced from petroleum. MECCA's proposed manufacturing facility was to be the first privately owned tufted carpet plant in Egypt. The facility was also designed for the production of woven carpets and tapestries.

McDermott was placed on the MECCA Board of Directors and named assistant managing director for the Alexandria facility. McDermott selected and ordered the equipment necessary for the production of finished goods. The prevalent standard of measurement in the Middle East was and remains the metric system. Fully cognizant of this fact, McDermott ordered a finishing machine necessary for attaching secondary backing [2] to tufted carpet specifically designed to produce carpet in four and five meter widths.

Construction of the plant began after a Kuwaiti contractor was selected in February of 1977 to erect the building. McDermott ordered the needed raw materials, including primary and secondary jute backing.[3] These goods were inadvertently ordered in twelve foot widths. McDermott did not realize at the time that he had purchased raw materials that were incompatible with the finishing machinery components.

Lacking adequate technical and production expertise, CMI and McDermott employed an international carpet consulting firm to assist in the commencement of operations. Despite the efforts of all involved, the progress at the plant fell behind schedule. Delays caused by construction, customs, credit, voltage fluctuations [4] and

---

**2.** Primary backing is the mesh material into which carpet fibers are tufted. Secondary backing is any substance which is attached to the primary packing to lend strength and support. There are three main types of primary backing. The first is latex which is a synthesized plastic and provides a durable and inexpensive protective coating. The second is foam which provides support, insulation and cushion. The third is jute—a popular and versatile twine

mesh manufactured from natural or synthetic fibers.

**3.** *See supra* note 2.

**4.** McDermott blamed part of the delay in the commencement of production on irregular electrical voltage powering the manufacturing equipment. According to McDermott, this prob-

inadequate capital[5] postponed the projected date of completion from the fall of 1977 to August, 1978.

Dissatisfied with the status of progress, MECCA officials terminated the consulting firm's contract and called for the comencement of production within sixty days. After determining that it was impossible to meet this deadline, McDermott suspended his managerial duties and left Egypt on July 14, 1978. Upon return to the United States, McDermott appropriated $20,000.00 from a MECCA account for his personal use.

In August of 1978, MECCA officials learned that the finishing machine equipped with a four and five meter laminating section[6] could not operate with twelve foot raw materials. In order to remedy the situation, MECCA was faced with the choice of ordering four meter primary and secondary backing or obtaining a twelve foot laminating section. MECCA officials chose to do both. The new laminating section and the four meter raw materials arrived shortly before May, 1979. Consequently, McDermott's oversight in ordering incompatible goods and machinery caused an eight-month delay in the production of tufted carpet.

After commencement of the tufted carpet operations, MECCA suffered diminishing net losses in 1979, 1980 and 1981. In early February of 1982, the entire plant was destroyed by fire. MECCA rebuilt the plant in October of 1982 after receiving an $11,700,000 insurance settlement. After the new factory was reconstructed, the operation became profitable.

### B. *Course of Proceedings*

In a letter dated December 15, 1979, legal counsel for MECCA informed CMI that

MECCA was requesting reimbursement of over two million dollars for losses and expenses allegedly caused by CMI's breach of the management agreement. MECCA sent CMI a demand for arbitration dated March 14, 1981. In a complaint filed June 1, 1981 in the United States District Court for the Northern District of Georgia, McDermott and CMI sought a restraining order enjoining MECCA from initiating arbitration proceedings in Kuwait.

Although MECCA was served with a summons and a copy of CMI's complaint by certified mail, MECCA failed to respond within the time permitted by law. Pursuant to Fed.R.Civ.P. 55(b), the district court entered default judgment in favor of CMI and McDermott and enjoined arbitration proceedings on November 4, 1981. Because of a defect in service, the district court set aside the default judgment on January 29, 1982 and ordered McDermott and CMI to serve MECCA through diplomatic channels.

While McDermott and CMI were in the process of perfecting service, the Kuwaiti Court ruled that the issues raised by MECCA's allegations were nonarbitrable. MECCA was properly served through diplomatic channels on May 2, 1983. MECCA filed a timely answer and counterclaim on July 1, 1983. Both parties amended their pleadings.

The amended complaint filed on behalf of CMI and McDermott sought a declaration of an equity interest in MECCA, reimbursement for a bonus paid by CMI to the project manager, reimbursement for losses incurred in the disposal of yarn ordered for MECCA and paid for by CMI, payment of $120,000 in advances specified by the

---

lem could only be alleviated if voltage regulators were installed.

**5.** McDermott testified that he uncovered a series of fraudulent transactions which unnecessarily depleted the capital invested by the Royal Family of Kuwait and others. According to McDermott, El Farra obtained inflated bids from the machinery manufacturers and received kickbacks after the sales were consummated. McDermott alleges that as a result of the royal

scam, El Farra diverted approximately $300,000 from MECCA and deposited the funds in a secret bank account.

**6.** A laminating section consists of two rollers and several attachments and is used to attach secondary backing to tufted carpet. Each roller weighs several hundred pounds and must be manufactured to the thousandth of an inch.

management agreement, and payment of salary allegedly owed by MECCA to McDermott. MECCA's amended counterclaim sought damages imposed individually against McDermott and vicariously against CMI for alleged violations of corporate duties as well as damages for breach of contract by CMI.

The issues were joined, discovery was completed and the case was referred on January 10, 1985 to a United States Magistrate as special master pursuant to Fed.R. Civ.P. 53. The special master was instructed to identify the issues in the case and prepare findings of fact and conclusions of law. An evidentiary hearing was conducted from May 28, 1985 to June 7, 1985. After considering the testimony of sixteen witnesses and reviewing approximately 650 exhibits, the special master filed a report in accordance with Fed.R.Civ.P. 53(e). The special master found that McDermott waived the advances specified in the management agreement, was not entitled to any salary,[7] and acted as a volunteer in paying the project manager's bonus.

The special master recommended that MECCA recover a total of $941,496.40, including $845,196.40 representing lost profits attributable to the eight month delay in production, $41,000 for misappropriation of funds by McDermott including interest, and $35,302 for the loss of use of funds frozen by the purchase of raw materials. The magistrate also recommended that CMI recover $9,964 for the loss incurred by CMI when disposing of 10,000 pounds of yarn purchased on behalf of MECCA.

CMI and McDermott filed objections to the special master's findings of fact and conclusions of law on November 8, 1985. After reviewing the record, the transcript of the evidentiary hearing, the special master's report and objections thereto, and a memorandum submitted by MECCA in opposition to the objections, the district court adopted the special master's findings of

fact and conclusions of law *in toto* on December 13, 1985. Final judgment was entered on December 24, 1985. CMI and McDermott filed a notice of appeal on January 10, 1986.

## II.

## DISCUSSION

### A. *Lost Profits*

CMI and McDermott contend that the evidence of lost profits was too speculative and uncertain to justify MECCA's $845,-194.40 award. Specifically, CMI and McDermott allege that the special master erroneously (1) admitted and refused to strike the testimony of economist Bruce Seaman, (2) entered judgment for lost profits based on a subsequent history of profits, and (3) predicated the amount for lost profits on an eight month delay in reaching full profitability rather than determining the profits, if any, which MECCA would have derived from operations during the period of inactivity.

■ In diversity cases, the determination of damages constitutes a substantive issue. *Hill v. Nelson,* 676 F.2d 1371, 1374 (11th Cir.1982). Thus, Georgia law governs awards for lost profits. *See* e.g., *Bassett Furniture Industries of North Carolina, Inc. v. NVF Co.,* 576 F.2d 1084, 1088 (5th Cir.1978).[8]

Generally, Georgia law prohibits awards for lost profits based on speculation, conjecture or hypothesis. *See Moultrie Farm Center, Inc. v. Sparkman,* 171 Ga.App. 736, 320 S.E.2d 863, 866 (1984); *Southern Crate & Veneer Co. v. McDowell,* 163 Ga. App. 153, 293 S.E.2d 541, 543 (1982); *Claxton Poultry v. City of Claxton,* 155 Ga. App. 308, 271 S.E.2d 227, 234 (1980). Nevertheless, "where the type of business and history of profits make the calculation of profits reasonably ascertainable, evi-

---

7. It is undisputed that CMI received $200,000 for managerial services rendered pursuant to the terms of the management agreement.

8. The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

dence of lost profits may be considered." *Moultrie Farm Center*, 320 S.E.2d at 866; *Southern Crate & Veneer Co.*, 293 S.E.2d at 543; *Claxton Poultry Co.*, 271 S.E.2d at 234. In order to recover, a claimant must show three things. First, the anticipated profits must be capable of reasonable ascertainment. *Moultrie Farm Center*, 320 S.E.2d at 866; *Southern Crate & Veneer Co.*, 293 S.E.2d at 543. A claimant need not provide an exact dollar figure; it is sufficient if the facts provide a rational basis of computation. *Tri-State Systems, Inc. v. Village Outlet Stores, Inc.*, 135 Ga.App. 81, 217 S.E.2d 399, 403 (1975). Second, the damages must be within the contemplation of the parties if the action is in contract. *See generally Olsen & Company, Inc. v. Lunsford*, 99 Ga.App. 215, 108 S.E.2d 304, 305–06 (1959) (discussing the scope of damages recoverable in contract and tort). Third, the lost profits must be directly traceable to the wrongful acts of the other party. *Molly Pitcher Canning Co. v. Central of Georgia Railway Co.*, 149 Ga.App. 5, 253 S.E.2d 392, 397 (1979), *Tri-State Systems*, 217 S.E.2d at 402.

In this case, MECCA offered the testimony of Dr. Bruce Seaman[9] on June 5, 1985. After qualifying as an expert witness in economics, Dr. Seaman testified that in the natural life cycle of a manufacturing facili- ty, a plant generally undergoes a scheduled start-up period before full production is reached. During this period, it is likely that the plant will sustain losses for two to three years. After that period of time, manufacturing facilities generally cross the break-even point and become profitable as full productive capacity is reached.

Dr. Seaman further testified that a delay in commencing production will cause a corresponding delay in reaching full profitability. With the aid of arithmetic and geometric models, Dr. Seaman demonstrated that the eight month delay in production caused by McDermott's ordering oversight cost MECCA the equivalent of eight months' net income. After considering several facts and reviewing relevant documents,[10] including MECCA's profit and loss statement from 1983, Dr. Seaman calculated that the delay in reached full profitability caused a net loss of $105,649.30 per month. The special master adopted this figure and awarded MECCA a sum representing lost profits for eight months.

CMI and McDermott contend that lost profits should not have been awarded because MECCA was an unestablished business, the 1983 financial statement was not a representative period,[11] and Dr. Seaman failed to sufficiently consider the relevant market variables.[12] We disagree.

First, although Georgia courts have shown reluctance in awarding lost profits to new business ventures, *see Molly Pitcher Canning*, 253 S.E.2d at 397; *Radlo of Georgia, Inc. v. Little*, 129 Ga.App. 530, 199 S.E.2d 835, 838 (1973), we do not believe that this disinclination should bar recovery in this case. The rationale behind the "unestablished business rule" is that "evidence of expected profits from a new business is too speculative, uncertain, and

9. Bruce Seaman received a Ph.D in Economics from the University of Chicago in 1978 and was an Assistant Professor of Economics at Georgia State at the time of his testimony.

10. Dr. Seaman examined and considered MECCA's financial statements which survived the fire, a production manual prepared by the international consulting firm hired by CMI containing projections of production and profit, an insurance report prepared by Lloyd's of London, and an estimate of lost profits prepared by an Egyptian expert. Dr. Seaman also adjusted his figures to accommodate for a change in the number of tufting machines in operation after the fire.

11. CMI and McDermott claim that 1983 is not a representative period from which to ascertain lost profits because of changes in the plant after the fire, namely, new management, production in meters, the elimination of tapestry production, and the infusion of $11,700,000 of insurance proceeds.

12. CMI and McDermott argue that Dr. Seaman failed to consider several variables which could affect profitability, including changes in the cost of materials, the availability and proficiency of labor, and fluctuations in sales and marketing.

remote to be considered, and does not meet the legal standard of reasonable certainty." *Radlo,* 199 S.E.2d at 838. Where, however, as here, a claimant can show a "track record" of profitability, evidence can be considered and lost profits can be awarded. *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.,* 176 Ga.App. 586, 337 S.E.2d 29, 35 (1985); *see Bennett v. Smith,* 245 Ga. 725, 267 S.E.2d 19, 20 (1980); *Moultrie Farm Center,* 320 S.E.2d at 866.

■ Second, we find no error in Dr. Seaman's reliance on MECCA's 1983 financial statements when assessing the company's claim for lost profits. MECCA was in its fourth year of operation.[13] The new facilities constructed after the fire produced the same kind of carpet with substantially similar machinery. The carpet was sold in the same market. The fact that MECCA's losses were diminishing prior to the fire suggests that the operation was approaching the break-even point and was soon to become profitable.

■ Third, Dr. Seaman sufficiently considered the material market variables. During cross-examination, Dr. Seaman emphasized that his arithmetic and geometric economic models would remain accurate despite changes in management, labor, capital or raw materials. Although variations with these factors would influence the level of profitability, these changes would not affect the basic parallel nature of the plant's growth paths from the commencement of operations to full profitability. Dr. Seaman also acknowledged and stressed the significance of the stable and monopolistic Egyptian market. He stated that extraordinarily high tariffs placed on tufted carpet by the Egyptian Government protected MECCA from foreign competition and eliminated many of the economic variables common to a free market.

■ The admission of expert testimony is a matter entrusted to the discretion of

the trial court. *Manufacturing Research Corp. v. Graybar Electric Co.,* 679 F.2d 1355, 1366 n. 21 (11th Cir.1982). After reviewing the record, we agree with the district court that the special master did not abuse his discretion by considering Dr. Seaman's testimony. The findings of a special master may not be reversed in the absence of clear error. *Archambault v. United Computing Systems, Inc.,* 786 F.2d 1507, 1511 (11th Cir.1986). Here, the special master found that MECCA established lost profits with reasonable certainty, that the loss was within the contemplation of the parties, and that the loss was directly traceable to the acts of McDermott. The district court agreed.

■ A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *Archambault,* 786 F.2d at 1511–12. After a careful review of the record, we are not left with a definite and firm conviction that an error has occurred. We are satisfied that the award for lost profits has adequate support in the record. We do not consider the evidence presented too speculative, uncertain and remote. Accordingly, MECCA's award of $845,194.40 is affirmed.

**B.** *McDermott's Equity Interest in MECCA*

McDermott contends that the special master erred when ruling that McDermott was not entitled to a declaration of an equity interest in MECCA. In support of this contention, McDermott cites *Pickett v. Paine,* 230 Ga. 786, 199 S.E.2d 223 (1973). In *Pickett,* a minority shareholder assisted in acquiring certain real property pursuant

---

**13.** MECCA began operations in May 1979 and suspended operations in February of 1982 because of the fire.

to an oral agreement and sought a declaration of an equity interest in the land. The shareholder asserted that under the terms of the contract, he was to receive a ten percent interest in the real estate in exchange for his services. The Georgia Supreme Court ruled that the shareholder alleged sufficient facts to exempt the oral contract from the applicable statute of frauds for the purpose of defeating a motion for summary judgment. *Pickett,* 199 S.E.2d at 229.

■ We find *Pickett* factually and legally inapposite. In the case sub judice, the record unequivocally reflects that McDermott's shares of MECCA stock were pledged as security for a loan, that McDermott defaulted on his payments, and that the stock was sold through foreclosure proceedings. We discern no evidence of fraud with respect to the loan. Under these facts, we fail to recognize any legal basis upon which McDermott is entitled to either a remedy at law or relief in equity. Accordingly, the district court's upholding of the special master's denial of a declaration of an equity interest is affirmed.

## C. *Augmentation of Damages*

First, the special master awarded MECCA $21,000 interest representing seven years' lost return on investment for the $20,000 misappropriated by McDermott. The special master awarded interest at fifteen percent—the rate of return on investment in Egypt at the time in question. After reviewing the record, we agree with CMI and McDermott that the special master should have applied the seven percent interest rate provided by Ga.Code Ann. § 7–4–2 (Supp.1985). This error was not corrected by the district court.

■ In diversity cases, the state interest rate applies. *Royster Co. v. Union Carbide Corp.,* 737 F.2d 941, 948 (11th Cir.1984). Here, the record reveals that the parties stipulated that Georgia law would apply and failed to establish a rate or interest applicable to misappropriated funds which would negate the effect of § 7–4–2. A court of appeals has the authority to reduce a judgment under the appropriate circumstances. *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 747 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Quality Foods, Inc. v. U.S. Fire Insurance Co.,* 715 F.2d 539, 543 n. 3 (11th Cir.1983). Accordingly, MECCA's award for interest representing the loss of use of $20,000 for seven years is reduced to $9,800.

Second, the special master awarded MECCA $35,302 representing fifteen percent interest on the loss of use of $353,020 expended for raw materials which sat idle for eight months. CMI and McDermott contend that this award is improper. We agree that the district court should have stricken this award.

■ This court has already affirmed MECCA's recovery for lost profits. It would constitute a double recovery if MECCA was awarded the profits which would have been realized had the raw materials been consumed, plus the amount that MECCA could have earned by investing the funds used to purchase the raw materials. Double recoveries for one injury are not permitted under Georgia law. *Morreale v. Downing,* 630 F.2d 286, 290 (5th Cir.1980); *Davis v. Davidson,* 175 Ga.App. 451, 333 S.E.2d 648, 649 (1985); *Beltz v. Atlanta Coachworks Corp.,* 172 Ga.App. 604, 323 S.E.2d 901, 903 (1984). MECCA has made an election of remedies by seeking lost profits. Accordingly, MECCA's $35,302 award for loss of use of funds frozen by the purchase of manufacturing materials is vacated.

The judgment of the district court is AFFIRMED in part, MODIFIED in part and REVERSED in part.