ACCESSORY OVERHAUL GROUP,
INC., Plaintiff,

v.

MESA AIRLINES, INC. and Mesa
Air Group, Inc., Defendants.

Civil Action No. 1:12–cv–3638–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 21, 2014.

Charles K. McKnight, Jr., Gary James Toman, Nations, Toman & McKnight, LLP, Atlanta, GA, for Plaintiff.

Gordon Lee Garrett, Jr., Kacy Goebel Romig, David Holmes Bouchard, Robert Allen Schmoll, Jones Day, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This case comes before the Court on Defendants Mesa Airlines, Inc. and Mesa Air Group, Inc.'s motion for summary judgment [35].

## I. Background

This is a business dispute between a service provider and its customers. Plaintiff Accessory Overhaul Group, Inc. ("AOG") provides commercial aircraft component testing, overhauling and certification services. Mesa Air Group, Inc. ("Mesa") and its subsidiary, Mesa Airlines, Inc., operate commercial aircraft, and in 2007 Mesa requested bids for servicing the wheels, tire and brakes of Defendants' aircraft. AOG submitted a bid, which Mesa accepted in the fall of 2007.

AOG began performing work for Mesa in October 2007, and the next month the parties executed a memorandum of understanding ("MOU"). The MOU provides that it "shall remain in effect until the execution of the Contract by the Parties or its termination as described herein."

From 2007 to 2012, AOG serviced and maintained Mesa's wheels, tires and brakes. The present dispute centers on whether the parties ever executed the contract contemplated by the MOU.

In January 2010, Mesa filed for bankruptcy protection, and the bankruptcy court deemed AOG a "critical vendor." Thus, Mesa continued its commercial relationship with AOG, and on January 14, 2010, the parties executed a critical trade agreement. The CTA broadly defined the parties' relationship during Mesa's bankruptcy case.

Sometime in 2011, after Mesa had emerged from bankruptcy, the parties resumed negotiations of a more detailed contract. AOG's president, Ron Byrd, worked with Scott Johnson, Mesa's senior director for maintenance and engineering technical administration, to draft the contract. According to Byrd, the parties were no longer operating under the CTA and the MOU had expired.

Byrd and Johnson exchanged several drafts of an agreement. Byrd had the authority to sign agreements on behalf of AOG; Johnson did not have signing authority for Mesa. On November 21, 2011, Johnson sent Byrd an email, stating that he had updated the pricing per AOG's request and that he had included with his email "a soft-copy version as well as the PDF." Johnson then stated, "If you're good, please sign and return. Then, I'll route through our contract signature process here at Mesa." Byrd signed and returned the document that day. However, AOG never received a copy of the November 21 document signed by Mesa.

Nonetheless, Byrd testified that he believed that his signature "indicated that the contract was … a binding contract" and that Mesa had previously not sent back a signed document in a timely fashion. Byrd also testified that he knew

Mesa had a process for signing contracts; indeed, on November 23, 2011, Johnson emailed Byrd to inform him that Johnson was putting the document "in the contract sign-off pipe. It should be signed by the executive team next week." However, the Mesa team did not sign the November 21 document. On December 20, Johnson emailed Byrd that he had contacted "Legal a couple of times" about signing the November 21 document, and that he would check again.

On January 3, 2012, Johnson informed Byrd that the document had "hit a snag" in the finance department. Mesa's senior vice president of finance had "rejected" a term dealing with late fees, and Byrd agreed to the removal of that term. On February 24, Johnson notified Byrd about another issue: Byrd had failed to fill in the amount of commercial/product liability insurance AOG carried in the appropriate blank in the November 21 document. Byrd responded that day with the amount of its coverage, which Johnson put in the document.

In March 2012, Johnson presented the November 21 document to Mesa's president, Michael Lotz, for his review. Lotz refused to sign the contract because of two provisions, including the one upon which AOG seeks to recover in this action. AOG contends that Mesa never told it that Lotz rejected two provisions and refused to sign the November 21 document.

On May 9, 2012, AOG met with Mesa to discuss a rate increase. During the meeting, AOG's CEO represented that although AOG wanted to keep working with Mesa, it could not do so unless Mesa agreed to a rate increase. AOG unequivocally told Mesa during the meeting that if the rate did not increase, it would cease work with Mesa right away or "pretty quickly." Mesa responded that it was going to put

the wheel, tire and brake work back out for bid immediately.

In a follow-up letter sent May 14, 2012, AOG again stated that the rate increase was absolutely necessary for AOG to continue its relationship with Mesa. That same day, Mesa issued a new request for proposals on the wheel, tire and brake maintenance work. AOG bid on the work at its increased rate. By the end of June, Mesa had chosen a different vendor, and on June 30 Mesa removed the majority of its aircraft from AOG's servicing. The remainder of Mesa's aircraft was removed from AOG's servicing in August.

On August 9 and 10, 2012, AOG sent Mesa the invoices that are the subject of this action, seeking over $3.4 million. The invoices bill Mesa for an aircraft-removal charge that AOG calculated pursuant to paragraph 7.2 of the November 21 document. AOG contends that Mesa must pay it for removing aircraft with AOG-repaired wheels, tires and brakes that it had not yet been paid for. Paragraph 7.2 is one of the two paragraphs that Lotz rejected when he reviewed the document in March 2012. Thus, Mesa refused to pay the invoices on the basis that the November 21 document is not a binding contract.

On October 18, 2012, AOG filed this action averring claims for breach of contract, prejudgment interest, and attorney's fees under O.C.G.A. § 13–6–11. AOG contends that Mesa prematurely removed aircraft from AOG's service, and consequently Mesa must compensate AOG. In the alternative to its breach-of-contract claim, AOG pleads claims for quantum meruit, unjust enrichment and promissory estoppel. AOG's claims and damages computations are premised on paragraph 7.2 of the November 21 document.

AOG was granted leave to file an amended complaint, which it did on December 20, 2012, and on January 10, 2013, Mesa filed an answer and counterclaim. On September 20, Mesa filed a motion for summary judgment on AOG's claims.[1] On January 16, 2014, the Court held a hearing on Mesa's motion and heard argument from the parties' attorneys.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir.1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing

---

1. Defendants' motion does not address their counterclaim.

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). The second is to show that "there is an absence of evidence to support the non-moving party's case." *Id.* (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must " 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548).

### III. Discussion

#### A. Breach of Contract

The viability of AOG's breach-of-contract claim depends on whether the November 21 document is a binding contract. Defendants argue that Mesa never assented to the final draft, and consequently the November 21 is not binding. Mesa also argues that even if the contract were binding, AOG anticipatorily breached the contract when it unequivocally refused to perform unless Mesa agreed to a rate increase.

Before evaluating the parties' arguments as to whether the November 21 document was in fact a binding contract, the Court first determines whether the Uniform Commercial Code or Georgia common law governs the dispute.

##### 1. Governing Law

Whether the UCC or common law applies depends on whether the parties' relationship predominantly involved goods or services. AOG contends that the predominant purpose of its relationship with Mesa was the provision of goods, and

therefore the UCC applies. Defendants respond that AOG performed repair services, and while those services may have involved goods, the primary purpose of AOG's work was to service the wheels, tires and brakes of their aircraft.

Article 2 of the UCC, O.C.G.A. § 11–2–101 et seq., applies "only to transactions in goods and not to service or repair contracts." *Alco Standard Corp. v. Westinghouse Elec. Corp.,* 206 Ga.App. 794, 426 S.E.2d 648, 650 (1992). Difficulty arises when, as here, the contract involves both goods and services. "When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies, even though a substantial amount of service is to be rendered in installing the goods." *Heart of Tex. Dodge, Inc. v. Star Coach, LLC,* 255 Ga.App. 801, 567 S.E.2d 61, 63 (2002). "When, on the other hand, the predominant element of a contract is the furnishing of services, the contract is viewed as a service contract and the UCC does not apply." *Id.*

In repair-contract cases, which typically involve goods and services, courts look to the "fundamental nature of the transaction." *Id.* "The primary purpose of a repair transaction is not to sell or purchase parts, but to change or improve the item and return it to the owner. In such cases, the provision of goods is incidental, and the UCC does not apply." *Id.*

In *Alco,* the court held that the UCC did not apply, in part because there was no sale of goods between the parties—only a contract to repair the customer's autotransformers. Consequently, the "materials furnished [by the provider] in connection with the repair was merely an incidental part of the services provided." *Alco,* 426 S.E.2d at 650. Similarly, in *Heart of Texas Dodge,* the primary pur-

pose of the contract was to convert a vehicle and return it to the owner in a modified condition. And the company performing the work was "in the business of performing labor, not selling parts." Thus, the court held that the work was performed pursuant to a service contract and the UCC did not apply.

Here, the parties' own words show that the primary purpose of their relationship was for AOG to provide wheel, tire and brake services to Mesa. Beginning with the MOU, the parties characterized their relationship as a service-based one. The MOU provides that AOG would be the wheels/tire/brakes maintenance and repair and management services provider for Mesa. Thus, the MOU set forth the "terms and conditions under which AOG will provide such services to Mesa." Similarly, the CTA continued the parties' service relationship.

In addition, the November 21 document at issue is entitled "Wheel, Brake and Tire Cost per Landing Services Agreement," and the second paragraph states that AOG and Mesa "desire to enter into this Agreement with respect to the provision of the Services applicable to ... aircraft operated by Mesa during the Term [ ]." Section 2 of the November 21 document also lists the services that AOG will provide, which include repair and replacement of wheels and brakes delivered by Mesa to AOG and replacement of the tires Mesa removed from aircraft.

Finally, in its complaint AOG characterizes itself as a business that "provides parts and repair and maintenance services for commercial aircraft." AOG also avers that it had to purchase parts from third parties in order to repair and maintain Mesa's wheels, tires and brakes. This practice was confirmed by AOG's CEO, who testified that AOG bought parts from vendors to perform services for Mesa. *See*

*Heart of Tex. Dodge*, 567 S.E.2d at 63 (determining that primary purpose of repair contract was provision of services because repair company purchased conversion package it installed from a third-party vendor).

Thus, the evidence overwhelmingly shows that AOG is a service provider, not a seller of goods, and that the primary purpose of the parties' relationship was for AOG to repair and maintain the wheels, tires and brakes on Defendants' aircraft. Consequently, as in other repair-contract cases, "the provision of goods is incidental, and the UCC does not apply." *Heart of Tex. Dodge*, 567 S.E.2d at 63; *cf. D.N. Garner Co. v. Ga. Palm Beach Aluminum Window Corp.*, 233 Ga.App. 252, 504 S.E.2d 70, 73–74 (1998) (UCC applied where customer purchased windows and had them installed because primary purpose of transaction was purchase of goods and rendition of service was incidental, even though substantial amount of service was required to install windows). The Court will apply Georgia common law to evaluate the parties' arguments.

### 2. Anticipatory Repudiation

■ Defendants contend that even if the November 21 document were enforceable, which they strongly deny, AOG anticipatorily repudiated the agreement in May 2012 when it threatened to quit performing unless Mesa agreed to a rate increase.

AOG's CEO testified that he informed Mesa at an in-person meeting on May 9, 2012, that:

- "Unfortunately, we are losing money with you and we cannot continue doing business with you at these rates and I would love to keep your business."

- "But at the rates we're doing [your business] right now, we'll be out of

business in the next six months to a year."

- "You're either going to put us out of business or we've got to cut ties doing business immediately or, you know, pretty quickly or go up on our rates."
- "[W]e couldn't continue doing that business ... it was physically—mental[ly]—impossible to do it with the rates that we were making."

After being told this, Mesa informed AOG that it was going to rebid the work. Undeterred by this statement, on May 14 AOG sent Mesa a letter in which it stated the price increase was "required for us to not only continue this contract, but to remain financially responsible." That same day, Mesa issued a new request for bids on the service work AOG provided; AOG submitted a bid with its higher rates.

Defendants contend that AOG's message at the May 9 meeting and in the follow-up letter show that AOG presented Mesa with an "unconditional demand for a price increase" that anticipatorily repudiated the November 21 document. Consequently, Defendants assert that they were absolved of any obligations under the November 21 document and elected to rescind the contract, as allowed by law, by immediately putting the wheel/tire/brake service contract back out for bid.

AOG responds that its statements and letter did not constitute an unconditional demand with a threat of nonperformance. AOG contends that when it asked for a price increase, it repeatedly stated how much it valued its relationship with Mesa, which shows that its statements and letter are better characterized as invitations to negotiate. AOG also argues that it continued to perform wheel, tire and brake repair services and that Mesa accepted these services and continued to send AOG more assemblies. Finally, AOG states that it

never told Mesa that it would not perform, nor did Mesa tell AOG that Mesa was terminating or rescinding the contract.

■ An unqualified repudiation of a bilateral contract prior to the time of performance constitutes a breach of the entire contract that absolves the other party of any future performance. *Coffee Butler Serv., Inc. v. Sacha*, 258 Ga. 192, 366 S.E.2d 672, 673 (1988). "The breach which will form the basis for an anticipatory breach of contract action is an *unqualified* repudiation of the entire contract prior to the time for performance." *Id.* at 673 (quotations and citation omitted).

Here, AOG admits that it unequivocally stated both at the meeting and in a follow-up letter that it could not continue to work for Mesa at the current price and that it would have to "cut ties" immediately or "pretty quickly" if Mesa did not agree to the rate increase. AOG maintained this position even after Mesa indicated in the May 9 meeting that it was going to put the contract back out for bid in lieu of acceding to AOG's demand. This evidence shows that AOG anticipatorily repudiated the parties' agreement. *See Textile Rubber & Chem. Co. v. Thermo–Flex Techs., Inc.*, 301 Ga.App. 491, 687 S.E.2d 919, 922–23 (2009) (party freely admitted that it was unilaterally altering payment terms of contract and court construed this as an "absolute refusal to perform the contract as per its express material terms"); *J & E Builders, Inc. v. RC Dev., Inc.*, 285 Ga.App. 457, 646 S.E.2d 299, 301 (2007) (party anticipatorily repudiated requirement that restrictive covenants be presented prior to closing where party's president had "in no uncertain terms" already refused to record covenants that would have been presented).

■ AOG's statements about how much it valued its relationship with Mesa do not

show an intent to honor the contract if the rate increase were not approved or that AOG was merely inviting Mesa to negotiate rates. Invitations to negotiate must be accompanied by the party's intent to abide by the contract even if the negotiations fail. *Textile Rubber,* 687 S.E.2d at 923. Here, AOG's demands unequivocally communicated that AOG would have to cease work immediately or "pretty quickly." It maintained this position even after Mesa said it would rebid the work. Thus, AOG's mere expressions of how much it valued the relationship do not show intent to abide by the contract if the rates were not increased. *Cf. Jones v. Solomon,* 207 Ga. App. 592, 428 S.E.2d 637, 640 (1993) (terminated employee indicated in letter to employer that he intended to complete his termination period in a professional and courteous manner and "merely suggested" employer waive covenant not to compete in his contract).

AOG also argues that it continued to perform under the contract, thereby showing that it ultimately did not repudiate the contract. To evaluate this argument, the Court looks at Mesa's options once AOG repudiated the November 21 document. Mesa could (1) rescind the contract; (2) treat the repudiation as a breach; or (3) await the time for performance. *Piedmont Life Ins. Co. v. Bell,* 103 Ga.App. 225, 119 S.E.2d 63, 71 (1961). Mesa's actions indicate that it elected to immediately rescind the contract. Mesa informed AOG at the May 9 meeting that it would rebid the contract; on May 14, Mesa requested bids for the work performed by AOG; and AOG knew that the request for bids had been issued. In fact, AOG submitted a bid, and its filings in this Court suggest that its submission included the higher rates, further showing Mesa that AOG was not changing its position. By late June 2012, Mesa had awarded the work to another company, and given the process for finding a new service provider, Mesa transitioned as quickly as possible. *See* O.C.G.A. § 13–6–5 (party injured by breach "bound to lessen the damages as far as is practicable by the use of ordinary care and diligence").

In light of Mesa's unequivocal actions after AOG's unconditional demand for a rate increase, any continued work by AOG is insufficient to show that Mesa opted to treat the November 21 document as still binding and to await the time for AOG to perform. *Cf. Smith v. Ga. Loan, Sav. & Banking Co.,* 113 Ga. 975, 39 S.E. 410, 410–11 (1901) (injured party's failure to immediately repudiate contract after anticipatory breach resulted in its choosing by default to treat contract as still binding). Moreover, AOG's work for Mesa was critical to the safety of Mesa's aircraft, so it is logical that Mesa would not jeopardize the safety of its aircraft while it found a new wheel, tire and brake service provider. And Mesa represents that its dealings with AOG were minimal while it chose another provider, a point to which AOG has not offered any contrary evidence.

Finally, AOG argues that Mesa's rescission is ineffective because it failed to restore AOG to the position it occupied before Byrd signed the November 21 document. That is, AOG claims that Mesa was required to compensate it for the value of the wheels, tires and brakes on Mesa's aircraft that were removed from AOG's service. However, AOG has not provided any persuasive or binding authority that supports its position based on the facts of this case. Moreover, Mesa, as the innocent party, was "absolved from any future performance," which includes the requirement that Mesa pay AOG a fee for aircraft prematurely removed from AOG's service. *Textile Rubber,* 687 S.E.2d at 922.

Thus, the Court holds that even if the November 21 document were binding, AOG anticipatorily repudiated it, and as a result Mesa could, and in fact did, immediately rescind and seek a new service provider. Accordingly, Mesa is entitled to summary judgment on AOG's breach-of-contract claim. Therefore, the Court need not determine whether the November 21 document was a binding contract between the parties.

## B. Equitable Claims

In the alternative to its breach-of-contract claim, AOG pleads claims for quantum meruit, unjust enrichment and promissory estoppel. Before addressing Defendants' arguments in opposition to these claims, the Court will review the nature of these claims and the damages AOG seeks.

### 1. Nature of Claims and Damages

AOG avers in the facts section of its complaint that when Defendants removed the aircraft from its service, "Defendants had in their possession numerous wheel, tire and brake assemblies that AOG provided or worked on and for which AOG had not been paid." In its claims for equitable relief, AOG avers that it "provided valuable parts and services to Defendants with respect to wheels, tires and brakes for certain aircraft operated by Defendants." Thus, AOG limits its claims to work already performed and parts already provided. AOG maintains this position in its brief in opposition to Defendants' motion for summary judgment, contending that it should be compensated for services and parts already provided to Mesa.

AOG contends that Defendants must compensate it for the value of the services and parts it provided to Defendants for which AOG had not been fully compensated prior to removal of the aircraft. To measure its damages, AOG relies on para-graph 7.2 of the November 21 document. That paragraph provides in pertinent part that upon Mesa's removal of its aircraft from AOG's service, Mesa "shall include a report to AOG of the cycles remaining on such wheels and brakes until the next scheduled/expected removal based on the fleet average wheel and brake limitations set forth in [Appendix] 2. . . ." AOG then had the option to "inspect the tires and brakes of such aircraft in order to confirm such condition" within seven business days of its receiving Mesa's notice. If AOG did not inspect the aircraft, then Mesa's report was controlling.

Once the condition of the wheels, tires and brakes of the removed aircraft was confirmed, paragraph 7.2 required Mesa to "pay AOG for the cycles and tread life remaining on such wheels and tires based on the fleet average wheel and brake service limits set forth in [Appendix] 2 (and the then current replacement cost for such wheel, tire and brake in used, serviceable condition)."

Purportedly relying on this language, AOG bases its equitable damages on the invoices it sent to Mesa in August 2012. The invoices include charges for work performed on and the cost of parts both on Mesa's aircraft and on AOG's shelf. AOG filed with its brief in opposition an exhibit that details the calculations behind the invoices. These calculations show that the invoices include the cost of both parts and labor. In addition, AOG charged the purchase price of new parts plus a twenty-percent markup, and AOG also assumed 100–percent remaining life on all parts.

### 2. Damages Are Speculative

■ Defendants argue that AOG's equitable damages are speculative and thus fail as a matter of law. They contend that the measure of damages in equity is the benefit conferred on Mesa, and AOG has made

no attempt to calculate this amount. AOG responds that it seeks compensation for the goods and services it provided to Mesa.

The record shows that Mesa paid AOG for its work on Mesa's aircraft based on a cost-per-landing formula. Thus, AOG was not compensated based on the actual cost of its labor and parts purchased. Instead, it was essentially paid over time for its costs based on the frequency of an aircraft's landings, and the number of possible landings was limited by the useful life of the parts AOG installed on the aircraft. Of course the risk of this compensation method is the risk that parts fail before they should. Nonetheless, AOG essentially agreed to consider itself fully compensated for prior work once an aircraft's landings maximized the useful life of the parts AOG installed. As suggested by paragraph 7.2, if Mesa removed aircraft from AOG's service prior to the exhaustion of the useful life of the parts AOG installed, AOG was in theory not "fully" compensated under the cost-per-landing formula.

 "Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury or the trial judge in nonjury cases can calculate the amount of the loss with a reasonable degree of certainty." *Big Builder, Inc. v. Evans*, 126 Ga.App. 457, 191 S.E.2d 290, 291 (1972). The mere fact that a party failed to perform as required or expected "standing alone does not furnish a basis upon which the amount of the loss can be calculated." *Id.* "An allowance for damages cannot be based on guess work." *Id.* Thus, at the summary-judgment stage, reasonable inferences to be drawn from AOG's evidence of damages "cannot be based on mere conjecture or possibility or upon evidence which is too uncertain or speculative." *Hoffman v. AC & S, Inc.*, 248 Ga.App. 608, 548 S.E.2d 379, 382 (2001). The plaintiff must furnish suf-

ficient data to estimate its damages with reasonable certainty. *Moultrie Farm Ctr. v. Sparkman*, 171 Ga.App. 736, 320 S.E.2d 863, 867–68 (1984).

Here, AOG improperly uses paragraph 7.2 as a measure of its equitable damages, and even if use of that paragraph were proper, AOG improperly relies upon it in calculating its estimated damages. Thus, AOG has failed to carry its burden of providing sufficient evidence that would allow the Court or a jury to calculate its damages with reasonable certainty.

Beginning with the latter issue, AOG did not properly calculate its damages under paragraph 7.2. First, AOG seeks compensation for parts both on the removed aircraft and on its shelf. It contends that paragraph 7.2 allows this. It does not. That paragraph is limited to the parts on aircraft removed from AOG's service. Thus, AOG seeks to recover the value of parts to which it is not entitled under this paragraph.

Second, AOG bases its damages on what it paid for the parts plus a twenty-percent markup. Paragraph 7.2 does not allow this either, and AOG's counsel conceded at the January 16, 2014, hearing that this markup should not be included. Yet AOG did not produce modified invoices or an updated calculation of its alleged damages. What paragraph 7.2 does allow is compensation to AOG based on the remaining useful life and the "current replacement cost for such wheel, tire and brake in *used, serviceable* condition." (Emphasis added.) Thus, the invoices in the record, upon which AOG bases its damages, include expenses it cannot recover. This is yet another reason they must be excluded from evidence. *See, e.g., Lester v. S.J. Alexander, Inc.*, 127 Ga.App. 470, 193 S.E.2d 860, 862 (1972) (where medical bills fail to differentiate between relevant and irrelevant treatment, entire bills should be excluded);

*accord Tucker Nursing Ctr., Inc. v. Mosby,* 303 Ga.App. 80, 692 S.E.2d 727, 730 (2010).

Finally, AOG has assumed 100–percent useful life remaining on all parts. While the Court acknowledges AOG's representation that Mesa either could or would not provide this information, AOG should have estimated the remaining useful life. Presumably it kept records of when parts were installed and the landings reported by Mesa on a monthly basis. This information combined with the average useful life in Appendix 2 of the November 21 document would have provided a reasonable estimate of the remaining useful life.

Thus, even if paragraph 7.2 does provide a reasonable and proper method of calculating damages, AOG has not properly applied it, which leaves its requested damages wholly speculative.

As for whether damages calculated pursuant to paragraph 7.2 are even a proper measure of damages, the parties' relationship makes this a difficult question to answer. But ultimately the Court finds that it does not provide a method of calculating damages that is consistent with equitable theories of recovery.

As stated above, the parties intended for AOG to be fully compensated through the cost-per-landing formula, and this formula does not reflect the actual cost of AOG's services and part provided. And AOG has been at least partially compensated for some of its work and the cost of parts it purchased through cost-per-landing payments it received prior to its repudiation of the parties' agreement. Furthermore, paragraph 7.2 addresses the remaining value of parts serviced by AOG but does not appear to address the value of AOG's services performed or parts paid for but not installed on Mesa's aircraft.

As Mesa states, the measure of damages in equity is typically the value of the work performed by the plaintiff (quantum meruit), the benefit conferred on the defendant (unjust enrichment) or the amount necessary to prevent injustice (promissory estoppel). For example, the "measure of damages under quantum meruit or unjust enrichment is based upon the benefit conferred upon the defendant and not upon the cost to render the service or cost of the goods." *Zampatti v. Tradebank In'tl Franchising Corp.,* 235 Ga.App. 333, 508 S.E.2d 750, 757 (1998). AOG's requested damages under paragraph 7.2 do not represent the benefit conferred upon Defendants; rather, the focus is on the cost of goods AOG serviced. As for promissory estoppel, AOG may recover "those damages as are equitable and necessary to prevent injustice from occurring." *Hendon Props., LLC v. Cinema Dev., LLC,* 275 Ga.App. 434, 620 S.E.2d 644, 651 (2005), and it is hardly just or equitable, in light of the miscalculations identified above, for AOG to recover damages that paragraph 7.2 does not even allow. At the hearing, AOG did not offer a more accurate method of calculating its equitable damages. Thus, the Court and jury would be left to speculate as to those damages.

In conclusion, paragraph 7.2 does not provide a proper measure of AOG's equitable damages, and even if it did, AOG has not properly calculated its damages thereunder. As a result, AOG has not carried its burden of providing evidence sufficient to calculate its equitable damages with reasonable certainty. Accordingly, the Court will grant summary judgment on this basis.

### 3. Promissory Estoppel

Defendants also argue that AOG cannot show that Mesa ever made any promise upon which AOG could have rea-

sonably relied. AOG contends that Mesa, through one of its vice presidents, Gary W. Appling, and through its drafting and agreeing to paragraph 7.2, promised AOG that AOG would be compensated for fleet removals. Defendants respond that these are not promises and that AOG did not change its position as a result of these alleged promises.

 AOG may state a claim for promissory estoppel by pleading that (1) Defendants made a promise; (2) Defendants should have expected AOG to rely on that promise; (3) AOG did in fact rely on the promise to its detriment; and (4) injustice can be avoided only by enforcement of the promise. *Kamat v. Allatoona Fed. Sav. Bank*, 231 Ga.App. 259, 498 S.E.2d 152, 155 (1998). However, promissory estoppel does not apply to "vague or indefinite promises, or promises of uncertain duration." *Ga. Invs. Int'l, Inc. v. Branch Banking & Trust Co.*, 305 Ga.App. 673, 700 S.E.2d 662, 664 (2010); *see also Mariner Healthcare, Inc. v. Foster*, 280 Ga.App. 406, 634 S.E.2d 162, 168 (2006). Thus, in *Georgia Investments*, a promise to make a loan for a certain duration was held unenforceable because it was vague and indefinite as to other material terms, e.g., the interest rate.

Here, in a December 30, 2008 email to Byrd, Appling stated, "I want to assure you that we are not going to take freshly overhauled units and lease return them without a commercial settlement." This statement lacks any detail about how this transaction would occur, and in context Appling raised several other issues about the AOG–Mesa relationship that needed to be addressed and asked Byrd to call him

to discuss AOG's concerns. Thus, the statement does not rise to the level of a promise to pay AOG for aircraft removed from its wheel/tire/brake service. And even if this were a promise, AOG has not shown that it should have continued to rely on it in 2012, especially in light of Mesa's intervening bankruptcy and AOG's own statement after Mesa emerged from bankruptcy that the parties no longer had any type of agreement.

As for the November 21 document, AOG took a calculated risk of performing under the document before Mesa signed it. However, a party's risky business decision and the consequences that flow therefrom do not establish a promissory estoppel claim.

Thus, for these alternate reasons, Mesa is entitled to summary judgment on AOG's promissory-estoppel claim.[2]

### C. Other Claims

AOG also seeks attorney's fees under O.C.G.A. § 13–6–11 and prejudgment interest under O.C.G.A. § 7–4–15. Because AOG's underlying claims fail, Mesa is also entitled to summary judgment on these claims.

### IV. Conclusion

Defendants' motion for summary judgment [35] is GRANTED. However, this ruling does not resolve all issues before the Court, as Defendants' counterclaim remains pending. In light of the above rulings, the Court finds that the remaining issues can be resolved in mediation. Accordingly, the Court ORDERS the parties to mediation. On or before noon on Janu-

---

**2.** Because the Court finds that Mesa is entitled to summary judgment on AOG's equitable claims for the reasons stated above, the Court does not address Defendants' other arguments that equity does not permit AOG to recover a windfall and that AOG had a legal remedy, specifically, Georgia's materialman's lien statutes, that precludes its recovery in equity.

ary 28, the parties shall inform the Court whether they agree to a private mediator or to mediation conducted by one of this Court's Magistrate Judges.

IT IS SO ORDERED.